Samuel W. **BALDRIDGE**, Respondent,

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Appellant.**

**No. WD 60252.**

Missouri Court of Appeals, Western District.

Aug. 20, 2002.

---

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Keith V. Yarwood, Forest W. Hanna, III, Asst. Attys. Gen., Kansas City, for appellant.

Howard L. Lotven, Kansas City, for respondent.

Before BRECKENRIDGE, P.J., LOWENSTEIN and SMART, JJ.

PATRICIA BRECKENRIDGE, Judge.

The Director of Revenue appeals the trial court's judgment reinstating Samuel W. Baldridge's driver's license. The court set aside the revocation of Mr. Baldridge's license after finding that the Director failed to show by a preponderance of the evidence that Mr. Baldridge refused to submit to a chemical test of his breath after he was arrested for driving while intoxicated. The court also set aside the revocation on the basis that the surveillance videotape of Mr. Baldridge's arrest was not provided to Mr. Baldridge. On appeal, the Director claims that Mr. Baldridge's failure to give a proper breath sample constituted a refusal, as did his failure to consent to the officer's subsequent request for a urine test, despite the fact that the officer did not administer the implied consent warning a second time before requesting that he take the urine test. The Director also claims that the trial court's finding that Mr. Baldridge was not provided a copy of the surveillance videotape was beyond the scope of the trial

judge's authority under § 577.041, RSMo 2000,[1] to review license revocations for refusal to submit to a chemical test.

This court finds that the Director made a prima facie case for license revocation under § 577.041 because § 577.041 does not require that the implied consent law warning be given a second time prior to an officer requesting a second test, and the Director presented sufficient evidence that Mr. Baldridge refused to submit to the urine test. The court also finds that there was insufficient evidence of fraud, deceit, or bad faith to apply the spoliation doctrine for the Director's failure to produce the surveillance videotape to create the adverse inference that the videotape would have shown that Mr. Baldridge's conduct at the time of the stop did not indicate that he was intoxicated. Without that adverse inference, the Director made a prima facie case for license revocation. Therefore, the judgment of the trial court is reversed. Because the trial court's ruling in this case was a directed verdict at the close of the Director's case, the cause is remanded to allow Mr. Baldridge the opportunity to present evidence, if any, to rebut the Director's prima facie case. Because of the time that has elapsed while the appeal was pending, the trial court may conduct a new trial, rather than a continuance of the prior trial, if deemed beneficial by the trial court.

### Factual and Procedural Background

Around 11:30 P.M. on the night of February 13, 2001, Officer Travis Rhyne of the Lake Winnebago Police Department was patrolling 291 Highway when he saw a green Mitsubishi Diamonte passing oncoming traffic with its bright lights on. Officer Rhyne began following the Diamonte and noticed that the car crossed over the center line and was traveling four miles over the speed limit. Officer Rhyne pulled over the Diamonte.

As Officer Rhyne approached the car Mr. Baldridge, the driver, rolled down the driver's side window. Officer Rhyne immediately smelled the odor of an alcoholic beverage coming from the car. Officer Rhyne explained to Mr. Baldridge that he had been stopped because of his failure to dim his headlights to oncoming traffic and Officer Rhyne asked for Mr. Baldridge's driver's license and proof of insurance. As Mr. Baldridge was looking for his driver's license, Officer Rhyne asked Mr. Baldridge to explain why he failed to dim his bright lights. Mr. Baldridge said that he had his bright lights on because he could not see. Officer Rhyne then reminded Mr. Baldridge to get out his driver's license. Mr. Baldridge fumbled through his wallet and found his driver's license, but he was unable to find his insurance card after fumbling through papers in his glove box. As Officer Rhyne spoke to Mr. Baldridge, he noticed that Mr. Baldridge's pupils were very large, his eyes were glassy and red, his breath smelled like alcohol, and his speech was slurred. When Officer Rhyne asked Mr. Baldridge how much he had had to drink that night, however, Mr. Baldridge replied that he had not had anything to drink.

Officer Rhyne returned to his patrol car and ran a check on Mr. Baldridge's license through the Cass County dispatch. Officer Rhyne learned that Mr. Baldridge had had several previous traffic contacts, including a previous alcohol suspension. Officer Rhyne then asked Mr. Baldridge to step out of his car. As Mr. Baldridge got out of his car, he appeared to be off-balance. Officer Rhyne administered three field sobriety tests, all of which indicated that Mr. Baldridge was intoxicated.

1. All statutory references are to the Revised Statutes of Missouri 2000.

Officer Rhyne then asked Mr. Baldridge if he had smoked any marijuana. Mr. Baldridge said that he had smoked marijuana earlier in the evening. Officer Rhyne arrested Mr. Baldridge for driving while intoxicated. After he handcuffed Mr. Baldridge and placed him in the patrol car, Officer Rhyne advised Mr. Baldridge of his *Miranda*[2] rights.

Officer Rhyne took Mr. Baldridge to the police station, where he again informed Mr. Baldridge of his *Miranda* rights by reading the warning from the Department of Revenue's Alcohol Influence Report. Mr. Baldridge indicated that he understood his *Miranda* rights. Officer Rhyne then read the implied consent law warning from the Alcohol Influence Report. Specifically, Officer Rhyne told Mr. Baldridge that he was under arrest for driving while intoxicated; that to determine the alcohol or drug content of his blood, Officer Rhyne was requesting that Mr. Baldridge submit to chemical tests of his breath and urine; that if Mr. Baldridge refused to take the tests, his driver license would immediately be revoked for one year; and evidence of Mr. Baldridge's refusal to take the tests could be used against him in court.

Officer Rhyne first asked Mr. Baldridge to submit to a breath test. Mr. Baldridge did not ask to speak to an attorney before he agreed to submit to the test. Before administering the breath test, Officer Rhyne observed Mr. Baldridge for fifteen minutes to ensure that Mr. Baldridge did not have anything in his mouth. Officer Rhyne also checked the breathalyzer machine to make sure it was working properly.

The first time Mr. Baldridge blew into the machine, Officer Rhyne believed that Mr. Baldridge intentionally let air escape out the side of his mouth and his nose.

Officer Rhyne heard the air and felt it as he held onto the tube. The blow light on the machine did not disappear, and the machine did not record a result. Officer Rhyne stopped the test and explained to Mr. Baldridge that the machine indicates when the person is not properly blowing into the machine and he again instructed Mr. Baldridge how to properly blow into the machine. Mr. Baldridge blew into the machine a second time and again Officer Rhyne believed that Mr. Baldridge let the air escape out the side of his mouth and his nose. The machine did not record a result. Officer Rhyne reiterated how to properly blow into the machine and he told Mr. Baldridge that he did not have to give him another chance. The third time, Officer Rhyne believed that Mr. Baldridge blew lightly into the machine but again let air escape out of the side of his mouth and his nose. The machine's blow light was flashing periodically, but the machine recorded a blood alcohol content of .015%.

Even though the breathalyzer machine recorded a result after Mr. Baldridge's third attempt at blowing into the machine, Officer Rhyne did not believe the test was accurate because he thought Mr. Baldridge was intentionally letting air escape through his mouth and nose. Because he believed that Mr. Baldridge was intentionally giving an insufficient breath sample, Officer Rhyne marked on the Alcohol Influence Report that Mr. Baldridge had refused to take the breath test.

Officer Rhyne next requested that Mr. Baldridge take a urine test. Officer Rhyne requested the urine test because he thought the breath test was inaccurate due to Mr. Baldridge giving an insufficient breath sample and because Mr. Baldridge had admitted smoking marijuana earlier in the evening. Also, Officer Rhyne was

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

aware the law allowed him to request two chemical tests. When Officer Rhyne asked Mr. Baldridge to take the urine test, however, Mr. Baldridge said that he was not going to take it because Officer Rhyne could not ask for another test. After Officer Rhyne explained to Mr. Baldridge that he could ask Mr. Baldridge to submit to two tests, Mr. Baldridge again insisted that Officer Rhyne could not, and Mr. Baldridge said that he would not take the urine test.

When Officer Rhyne informed Mr. Baldridge he was marking down a refusal, Mr. Baldridge argued with Officer Rhyne and said that he had not refused anything. Officer Rhyne did not show Mr. Baldridge the results of the breath test because Mr. Baldridge had attempted to grab the results a couple of times before, and Officer Rhyne was afraid Mr. Baldridge would destroy the printout. When Officer Rhyne placed the printout of the breath test results under his desk and away from Mr. Baldridge's reach, Mr. Baldridge accused Officer Rhyne of throwing away evidence. So, Officer Rhyne picked up the printout and put it out of Mr. Baldridge's reach. Mr. Baldridge stood up, reached across the desk, and grabbed the paper out from under Officer Rhyne's hand. At that point, Officer Rhyne handcuffed Mr. Baldridge for safety purposes. After refusing to answer any of the interview questions from the Alcohol Influence Report, Mr. Baldridge again argued about the refusal and became "extremely belligerent." Officer Rhyne issued citations to Mr. Baldridge for failing to dim headlights to oncoming traffic; driving while intoxicated— refusal; and failing to provide proof of insurance on demand.

Officer Rhyne also served Mr. Baldridge with a notice from the Department of Revenue stating that his driving privilege was revoked for one year pursuant to § 577.041 because of his refusal to submit to a chemical test of his blood alcohol/drug content. Mr. Baldridge filed an application for a hearing in the circuit court.

A hearing was held in June 2001. Prior to the start of the hearing, Mr. Baldridge moved for sanctions against the Director on the basis that the Director had failed to provide him a copy of the printout from the breath test, a copy of all reports from tests conducted on the breathalyzer machine between December 13, 2000, and April 13, 2001, and a copy of the surveillance videotape of Mr. Baldridge's arrest. Mr. Baldridge argued that he had requested these items from the Director but the Director had told him that the videotape showed only the stopping of Mr. Baldridge's car and the remainder of the videotape had been taped over. Mr. Baldridge contended that the videotape was relevant to the issue of whether Officer Rhyne had reasonable suspicion to believe that Mr. Baldridge was under the influence. Mr. Baldridge requested that the court sanction the Director by striking Officer Rhyne's testimony.

In response to Mr. Baldridge's motion, the assistant prosecutor explained that the videotape showed only the beginning of the stop before cutting to a completely new day. The assistant prosecutor could not explain why but asserted that it must have been rewound accidentally. As for the breath test result printout, the assistant prosecutor stated that the original printout was accidentally sent to the Department of Revenue and his office was having difficulty getting it back from the Department. Finally, with regard to the reports from tests performed on the breathalyzer machine, the assistant prosecutor explained that the failure to produce those was an oversight on his part, as he failed to request them from the Lake Winnebago Police Department. Nevertheless, the assis-

tant prosecutor stated that the Director would stipulate that the breathalyzer machine did print out a result of .015% blood alcohol content on Mr. Baldridge.

The court overruled Mr. Baldridge's motion for sanctions and stated that it would allow Officer Rhyne to testify. The Director offered Officer Rhyne's testimony and the Alcohol Influence Report. At the close of the Director's case, Mr. Baldridge moved for a directed verdict. The court granted the motion, stating:

THE COURT: All right. Here's what I'm going to do. I want the Court of Appeals to know what I'm doing, so that then everybody can be clear on it.

First thing is, is I'm going to make a finding that there was a test that was performed and there was a sufficient sample. I've never heard of any situation in which—where there wasn't a breath test where it produced a result. Every time that I've ever had one in six years, it tells you no—not sufficient air. So there's a breath result in this case of .015. That's been stipulated to by the [Director], even though the [Director] failed to produce the strip per the request of [Mr. Baldridge] in this case.

Additionally, it also is important to note that there has been a failure to produce the videotape that was requested early in this proceeding. And so, that goes to credibility in regards to how this discovery was handled in this case.

Also, from the own testimony of the officer it's that the refusal was for the breath test that was given, not for the request for the urine test. And, that the breath test was a sufficient sample and therefore there was no refusal pursuant to state statute.

There is—I'll note, also, that there was no reading or indication from the evidence of the [Director] that a warning was given pursuant to state statute for the second test. There's no warning with regards to the rights pursuant to the request for the second test. So that all goes to what happened that night in Lake Winnebago. So, I do not believe that there has been a refusal on the part of [Mr. Baldridge] in this case to submit to a test that was requested, which was requested by the officer to be a breath test.

And so what I'm going to do is make a finding that not all of the elements of—under 577.041 have been met by the [Director] for the revocation of [Mr. Baldridge]'s license in this case.

And then I think we ought to have the order reflect that, because I know this is going up and I want to make sure that it's all clear, is what I was telling everybody, so we can find out what they think. I don't mind that. I like that idea, because it's kind of a unique situation. Okay.

And then if you can get me an order. If you guys can submit an order to reflect all that.

. . . .

[ASSISTANT PROSECUTOR]: Do you want specific findings?

THE COURT: Well, yeah. Because I think, like I said, they're going to want to know. I mean, I've kind of delineated them in here, so they shouldn't have any problem figuring out what I was thinking about. But I want to make sure that it's kind of in there.

[ASSISTANT PROSECUTOR]: Okay.

THE COURT: Because I think there's been some problems with the evidence, so I want to make sure that they know. With getting the evidence, I guess, and the discovery.

The court then entered a written judgment reinstating Mr. Baldridge's driver's license. In its judgment, the court found

that the Director failed to show by a preponderance of the evidence that Mr. Baldridge refused to submit to a chemical test of his breath and that the surveillance videotape of the arrest was not provided to Mr. Baldridge. The Director filed this appeal.

### Standard of Review

■ This court will affirm the judgment in a driver's license revocation case unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Phillips v. Wilson*, 66 S.W.3d 176, 178 (Mo.App.2002). This court views the evidence, and all reasonable inferences therefrom, in the light most favorable to the judgment and disregards all contrary evidence and inferences. *Callendar v. Dir. of Revenue*, 44 S.W.3d 866, 868 (Mo.App.2001).

■ "When reviewing the revocation of a driver's license for a refusal to submit to a chemical test, the trial court shall determine only the following: (1) whether the person was arrested; (2) whether the arresting officer had reasonable grounds to believe that the person was driving while intoxicated; and (3) whether the person refused to submit to the test." *Borgen v. Dir. of Revenue*, 877 S.W.2d 172, 174 (Mo. App.1994). *See also* § 577.041.4. The Director must establish each of these elements by a preponderance of the evidence. *Callendar*, 44 S.W.3d at 868. If the court finds that the Director has failed to prove any one of these elements, the court must order reinstatement of the driver's license. *Id.*; § 577.041.5.

### Prima Facie Evidence Mr. Baldridge Refused A Chemical Test

#### a. No Refusal of Breath Test

■ In her first point, the Director argues that the trial court erred in finding

that she failed to prove, by a preponderance of the evidence, that Mr. Baldridge refused to submit to a chemical test of his breath. The Director contends that Mr. Baldridge's failure to give a proper breath sample constituted a refusal to take that test.

Section 577.020.1(1), the implied consent law, provides that all persons who operate a motor vehicle on public highways in Missouri are deemed to have consented to a chemical test or tests of their breath, blood, saliva or urine to determine their blood alcohol or drug content if they are arrested for any offense arising out of acts for which the arresting officer had reasonable grounds to believe were committed while they were driving while in an intoxicated or drugged condition. This implied consent to submit to chemical tests is "limited to not more than two such tests arising from the same arrest, incident or charge." Section 577.020.2.

When the legislature enacted the implied consent law, it made the law "subject to the provisions of sections 577.020 to 577.041." Section 577.020.1. Section 577.041 is a "refusal" statute. *State v. Trumble*, 844 S.W.2d 22, 24 (Mo.App.1992). Section 577.041.1 provides, in pertinent part:

1. If a person under arrest ... refuses upon the request of the officer to submit to any test allowed pursuant to section 577.020, then none shall be given and evidence of the refusal shall be admissible in a proceeding pursuant to section 565.024 or 565.060, RSMo, or section 577.010 or 577.012. The request of the officer shall include the reasons of the officer for requesting the person to submit to a test and also shall inform the person that evidence of refusal to take the test may be used against such person and that the person's license

shall be immediately revoked upon refusal to take the test.

In this case, the Director's evidence was that after Officer Rhyne arrested Mr. Baldridge for driving while intoxicated, he drove Mr. Baldridge to the police station, where he informed Mr. Baldridge of the implied consent law. Officer Rhyne then asked Mr. Baldridge to submit to a chemical test of his breath. According to Officer Rhyne, although Mr. Baldridge orally consented to the breath test, he then tried to "fake out" the machine by not blowing properly into it, letting air escape out the sides of his mouth and his nose on all three attempts he was afforded. The first two times, the machine failed to indicate a result. The third time, the machine registered a result of .015% blood alcohol content. Even though the machine registered a result after Mr. Baldridge's third attempt, Officer Rhyne believed that Mr. Baldridge had intentionally given an insufficient sample, so he marked the box on the Alcohol Influence Report indicating that Mr. Baldridge had refused to submit to a chemical test.

The Supreme Court discussed what constitutes a "refusal" under the implied consent law in *Spradling v. Deimeke*, 528 S.W.2d 759, 766 (Mo.1975):

> There is no mysterious meaning to the word "refusal." In the context of the implied consent law, it simply means that an arrestee, after having been requested to take the breathalyzer test, declines to do so of his own volition. Whether the declination is accomplished by verbally saying, "I refuse", or by remaining silent and just not breathing or blowing into the machine, or by vocalizing some sort of qualified or conditional consent or refusal, does not make any difference. The volitional failure to do what is necessary in order that the test can be performed is a refusal.

The trial court found that Mr. Baldridge had, in fact, not refused to submit to the breath test because on his third attempt, he gave a sufficient sample to obtain a .015% result. The trial court stated that based upon its experience, if Mr. Baldridge had given an insufficient sample on his third attempt, the machine would not have registered a result. Even though Officer Rhyne testified that he believed, even on the third attempt, that Mr. Baldridge was intentionally failing to do what was necessary to perform the test, the trial court chose to resolve this conflict in the Director's evidence in favor or Mr. Baldridge. The trial court is afforded wide discretion in resolving conflicts in the evidence, even where there is evidence that would support a different result. *Long v. Dir. of Revenue*, 65 S.W.3d 545, 548 (Mo.App.2001). Thus, in light of this court's standard of review, this court defers to the trial court's finding that the Director failed to prove that Mr. Baldridge refused to submit to a chemical test of his breath.

### b. Refusal of Urine Test

The inquiry does not end there, however. The implied consent law allows for the officer to request two chemical tests. Section 577.020.2. In this case, the Director's evidence was that after Officer Rhyne marked on the Alcohol Influence Report that Mr. Baldridge refused to submit to the breath test, he asked Mr. Baldridge to submit to a chemical test of his urine. Mr. Baldridge told Officer Rhyne that he could not ask for another test. Officer Rhyne then explained to Mr. Baldridge that he could, in fact, request two tests and that the second test would be a urine test. Mr. Baldridge responded by again asserting that Officer Rhyne could not ask for another test and he told Officer Rhyne that he was not going to take a

urine test. Officer Rhyne informed Mr. Baldridge that he was marking down a refusal on the Alcohol Influence Report.

In its written judgment, the trial court stated only that the Director failed to prove that Mr. Baldridge refused to submit to a chemical test of his breath. The trial court did not make any findings in the written judgment regarding Officer Rhyne's request for a urine test. The court did discuss the urine test request in its oral findings, however. First, the court noted Officer Rhyne's testimony that he checked the "chemical test refusal" box on the Alcohol Influence Report after administering the breath test to Mr. Baldridge but before requesting the urine test. Thus, the court reasoned, the refusal was for the breath test and not the urine test and, since the court believed Mr. Baldridge had not refused the breath test, there was no refusal. Second, the court noted that Officer Rhyne did not read the implied consent law warning to Mr. Baldridge a second time before requesting the urine test.

The Director contends that the trial court's reliance on either of these findings to support its conclusion that the Director failed to make a prima facie case for license suspension constitutes an erroneous application of the law. This court agrees. Whether Officer Rhyne subjectively believed that Mr. Baldridge refused the breath test and, therefore, checked the "chemical test refusal" box on the Alcohol Influence Report before requesting the urine test,[3] is irrelevant to whether Mr. Baldridge's response to Officer Rhyne's request to submit to the urine test met the legal definition of "refusal." Regardless of Officer Rhyne's subjective belief as to the legal effect of Mr. Baldridge's actions regarding the breath test, Officer Rhyne was permitted to request a second test. The Director's evidence showed that Officer Rhyne requested that Mr. Baldridge submit to a urine test as the second test. The evidence further showed that after Officer Rhyne requested the urine test, Mr. Baldridge said that he would not take a urine test. The Director's evidence established that Mr. Baldridge refused to submit to a chemical test.

■ This conclusion is not affected by Officer Rhyne's failure to read the implied consent warning a second time before requesting the urine test. The implied consent law specifically permits two tests and nothing in the plain language of § 577.041 requires that the officer read the implied consent warning again prior to requesting a second test. As the Supreme Court stated in *Teson v. Director of Revenue*, 937 S.W.2d 195, 197 (Mo. banc 1996), "[t]he purpose of the warning provided in section 577.041.1 is to inform an apparently inebriated driver of the consequences that follow a refusal to consent to a chemical test to determine blood alcohol content." Therefore, the implied consent law warning is sufficient for due process purposes "unless the words used either (1) fail to inform the arrestee of all of the consequences of refusal or (2) mislead the arrestee into believing that the consequences of refusal are different than the law actually provides." *Id.* The Director's evidence showed that prior to requesting the breath test, Officer Rhyne read Mr. Baldridge the implied consent law warning "line for line" as it appeared on the Alcohol Influence Report. The implied consent law warning on the Alcohol Influence Report fully informed Mr. Baldridge of all of the consequences of refusal and did not mislead him into believing that the consequences of re-

---

**3.** There was no place on the Alcohol Influence Report for Officer Rhyne to make a second

checkmark after Mr. Baldridge stated he would not take the urine test.

fusal were different from what the law provides.

◼ Moreover, if Mr. Baldridge was confused about the consequences of refusing to submit to a second test, he had the affirmative duty to communicate his lack of understanding to Officer Rhyne. Where an arrestee is advised of his rights under the implied consent law and declines to take the chemical test, the arrestee is deemed to have refused the test "unless he objectively and unequivocally manifested that he did not understand his rights and the warning concerning the consequences of refusal and was denied clarification. A lack of understanding not made apparent to the officer is of no consequence." *Spradling*, 528 S.W.2d at 766 (quoting *Washington, Dept. of Motor Vehicles v. Riba*, 10 Wash.App. 857, 520 P.2d 942, 945 (1974)).

Here, the only issue about which Mr. Baldridge communicated any confusion to Officer Rhyne was whether Officer Rhyne could request a second test. Officer Rhyne then explained to Mr. Baldridge that the law allowed him to request two tests and he was requesting that the second test be a urine test. Despite Officer Rhyne's explanation, Mr. Baldridge continued to insist that Officer Rhyne could not ask for another test, and he told Officer Rhyne that he would not take the urine test. Mr. Baldridge's belief that the law did not allow Officer Rhyne to request a second test was not a result of Mr. Baldridge's lack of understanding of his rights but, rather, was a result of his decision not to accept Officer Rhyne's explanation of the implied consent law.

The Director's evidence established that Mr. Baldridge declined to submit to the urine test and, therefore, the Director satisfied the third element of her prima facie case, that Mr. Baldridge refused to submit to a chemical test. The trial court erroneously applied the law in finding otherwise.

## Failure to Produce Surveillance Videotape Irrelevant

◼ In her second point, the Director claims that the trial court erroneously applied the law in basing its decision, in part, upon its finding that the Director failed to provide a copy of the surveillance videotape of Mr. Baldridge's arrest to Mr. Baldridge. The Director contends that such a finding is beyond the scope of the trial court's authority under § 577.041.4, which limits the trial court to determining only (1) whether the person was arrested; (2) whether the officer had reasonable grounds to believe the person was driving while in an intoxicated or drugged condition; and (3) whether the person refused to submit to a chemical test. The Director argues that her failure to produce the surveillance videotape of the arrest is not relevant to any of these issues.

With regard to the surveillance videotape, the court, in its oral findings, stated, "Additionally, it also is important to note that there has been a failure to produce the videotape that was requested early in this proceeding. And so, that goes to credibility in regards to how this discovery was handled in this case." Mr. Baldridge contends that the court applied the spoliation doctrine to find that, because the Director failed to produce the surveillance videotape of Mr. Baldridge's arrest, Officer Rhyne did not have reasonable grounds to believe that Mr. Baldridge was driving while in an intoxicated or drugged condition.

◼ Missouri courts have recognized the spoliation doctrine since *Pomeroy v. Benton*, 77 Mo. 64, 86–87 (1882). *Moore v. Gen. Motors Corp.*, 558 S.W.2d 720, 733 (Mo.App.1977). " 'Spoliation' is the destruction or significant alteration of evidence.' " *Schneider v. G. Guilliams,*

*Inc.*, 976 S.W.2d 522, 526 (Mo.App.1998) (quoting *Baugher v. Gates Rubber Co.*, 863 S.W.2d 905, 907 (Mo.App.1993)). A party who intentionally spoliates evidence is subject to an adverse evidentiary inference. *Id.* "[T]he destruction of written evidence without satisfactory explanation gives rise to an inference unfavorable to the spoliator." *Garrett v. Terminal R. Ass'n of St. Louis*, 259 S.W.2d 807, 812 (Mo.1953). "Similarly, where one party has obtained possession of physical evidence which [the party] fails to produce or account for at the trial, an inference is warranted against that party." *State ex rel. St. Louis County Transit Co. v. Walsh*, 327 S.W.2d 713, 717 (Mo.App.1959). "[W]here one conceals or suppresses evidence such action warrants an unfavorable inference." *Id.* at 717–18.

▆▆▆▆ The standard for application of the spoliation doctrine requires that "there is evidence of an intentional destruction of the evidence indicating fraud and a desire to suppress the truth." *Moore*, 558 S.W.2d at 733. The requirement for evidence indicating fraud and bad faith was discussed further in *Morris v. J.C. Penney Life Insurance Co.*:

> When spoliation is urged as a rule of evidence which gives rise to an adverse inference, it is necessary that there be evidence showing intentional destruction of the item, and also such destruction must occur under circumstances which give rise to an inference of fraud and a desire to suppress the truth. In such cases, it may be shown by the proponent that the alleged spoliator had a *duty*, or should have recognized a *duty*, to preserve the evidence.

895 S.W.2d 73, 77–78 (Mo.App.1995) (internal citation omitted). "Since the doctrine of spoliation is a 'harsh rule of evidence, prior to applying it in any given case it should be the burden of the party seeking its benefit to make a prima facie showing that the opponent destroyed the missing [evidence] under circumstances manifesting fraud, deceit or bad faith.'" *Schneider*, 976 S.W.2d at 527 (quoting *Moore*, 558 S.W.2d at 735). In some circumstances, "destruction of evidence without a satisfactory explanation gives rise to an inference unfavorable to the spoliator." *Brown v. Hamid*, 856 S.W.2d 51, 57 (Mo. banc 1993). Simple negligence, however, is not sufficient to apply the adverse inference rule. *Brissette v. Milner Chevrolet Co.*, 479 S.W.2d 176, 182 (Mo.App.1972).

In this case, there was no evidence that the destruction of the surveillance videotape occurred under circumstances manifesting fraud, deceit, or bad faith on the part of the Director. The Director's explanation for failing to produce the videotape was that the videotape showed only the beginning of the stop of Mr. Baldridge before cutting to a completely new day. At most, the record shows simple negligence in that the videotape showing the rest of the stop was taped over.

Even if the trial court believed that a Lake Winnebago police officer had intentionally taped over the videotape of the stop, the circumstances do not indicate that the officer did so in bad faith or at the direction or encouragement of the Director. *See Schneider*, 976 S.W.2d at 528 (stating that, where a third person or agent of a party destroys evidence, there must be evidence that the "party in bad faith directed, encouraged, or in any other way took part in" the destruction). There is no evidence that Officer Rhyne had a duty or should have recognized a duty to preserve the surveillance videotape for the § 577.041 revocation proceeding. Section 577.041 did not require Officer Rhyne to submit a videotape of his stop and arrest of Mr. Baldridge to the Director to support the officer's contention that he had

reasonable grounds to believe that Mr. Baldridge had been driving while in an intoxicated or drugged condition. Rather, § 577.041.2(1) required Officer Rhyne to make only a *sworn report* to the Director that included, among other things, that Officer Rhyne had reasonable grounds to believe that Mr. Baldridge had been driving while in an intoxicated or drugged condition. Officer Rhyne did so, and that report was offered into evidence, along with Officer Rhyne's testimony.

Contrary to the Director's argument, the tape would have been relevant evidence that was admissible on the issue of whether Officer Rhyne had reasonable grounds to believe that Mr. Baldridge was driving while intoxicated. Nevertheless, the Director's failure to produce a videotape to "back up" Officer Rhyne's report and testimony, where the videotape was not required by § 577.041 and there was no evidence that the surveillance videotape was intentionally destroyed under circumstances manifesting fraud, deceit, or bad faith, does not defeat the Director's prima facie case for revocation.

The judgment of the trial court is reversed. Because the trial court's ruling in this case was a directed verdict at the close of the Director's case, the cause is remanded to allow Mr. Baldridge the opportunity to present evidence, if any, to rebut the Director's prima facie case. Because of the time that has elapsed while the appeal was pending, the trial court may conduct a new trial, rather than a continuance of the prior trial, if deemed beneficial by the trial court. *See Dickerson v. Wilson,* 15 S.W.3d 56, 59 (Mo.App. 2000).

All concur.