FREIGHT HOUSE LOFTS CONDO ASSOCIATION, Respondent,

v.

VSI METER SERVICES, INC., Appellant.

No. WD 75227.

Missouri Court of Appeals, Western District.

June 25, 2013.

Jeffrey A. Benoist, for Respondent.

Portia C. Kayser, Kansas City, for Appellant.

Before Division Three: JOSEPH M. ELLIS, Presiding Judge, CYNTHIA L. MARTIN, Judge and ROBERT CLAYTON III, Special Judge.

JOSEPH M. ELLIS, Judge.

Appellant VSI Meter Services, Inc. appeals from a judgment entered by the Circuit Court of Jackson County in favor of Respondent Freight House Lofts Condo Association on Respondent's claim that Appellant's negligent installation of a water meter at Respondent's property flooded the basement causing significant water damage to the property stored therein. For the following reasons, the judgment is affirmed.

The evidence, viewed in the light most favorable to the verdict, reflects the following. Appellant entered into a contract with the City of Kansas City, Missouri ("the City"), under which it agreed to install an automated water meter reading system in the basement of Respondent's property, the Freight House Lofts. The contract specified that Appellant would either retro-fit the existing water meter or replace the existing water meter with a new electronic meter. On September 1, 2009, Appellant replaced the existing water meter in the Freight House Lofts' basement with a new two-inch Neptune T-10 water meter after attempts to retro-fit the existing water meter were unsuccessful.

On October 18, 2009, Shane Adams, a maintenance technician for Respondent, noticed water draining outside the Freight House Lofts building. He called Mark Greathouse, Respondent's director of maintenance, to inform him about the water. Greathouse instructed Adams to check the basement. Upon doing so, Adams discovered the basement of the Freight House Lofts had flooded. During a subsequent phone call, Adams told Greathouse that the water was coming from the right flange of the water meter. Greathouse instructed Adams to shut-off the water. The following day, the City inspected and replaced the water meter in Respondent's basement. The City discarded the gaskets that were in the water meter at the time of the flood.

In 2011, Respondent filed a petition for damages alleging a count of negligence against both Appellant and the City. The case subsequently proceeded to trial. At trial, David Trinastich, a previous employee of Appellant, testified that he installed a new two-inch Neptune T-10 meter in Respondent's basement after attempting to retro-fit the existing meter. He further testified that he installed the meter using a drop-in gasket that he did not modify or cut in any manner and that the meter was not leaking when he left Respondent's property on September 1, 2009. A former Freight House Lofts maintenance technician testified that a few weeks after Trinastich installed the new meter, someone she believed to be a City employee came to Respondent's property to install additional equipment on the meter.

Greathouse, Respondent's director of maintenance, also testified at trial. He stated that Adams told him over the phone that the water meter was leaking and that Adams believed the gasket had exploded because water was shooting out of the flange on the water meter. Appellant timely objected to Greathouse's testimony regarding his phone conversations with Adams as impermissible hearsay. The trial court overruled Appellant's objection and permitted such testimony under the excited utterance exception to the hearsay rule.[1]

1. Adams could not be located by either of the parties prior to trial.

Steve Eden, who works at Century Fire Sprinklers, Inc. also testified at trial. Eden was called to the Freight House Lofts basement soon after Adams discovered the basement had flooded to determine whether the backflow preventer had caused the leak. Eden testified that, upon arrival, he turned the water back on to determine the source of the water leak. When he did so, water began shooting out of the flange on the right side of the water meter. Eden also testified that he noticed a gasket sticking out between the water meter's flanges and, when he went to inspect the gasket, he noticed the nuts and bolts holding the flanges in place were not very tight. Once Eden removed the gasket, he observed that the ends of the gasket had been cut.

Williams White, an area superintendent for the Kansas City Water Department, likewise testified that he noticed that the gaskets had been cut when he arrived to inspect the meter the day after the flood. He further testified that no record existed of City employees performing any kind of maintenance on Respondent's water meter between September 1, 2009, when Appellant installed the meter, and October 18, 2009, when the basement flooded.

Robert Webster, a professional engineer who had fifteen years of experience in the plumbing industry, provided expert testimony on Respondent's behalf. He testified about torque loss, which he explained occurs when the bolts holding the flanges together begin to expand and the joint starts to leak. He then opined that installing a water meter with a cut gasket and loose bolts falls below the standard of care in the industry for installing a Neptune T–10 water meter. The trial court overruled Appellant's timely objection to Webster's expert testimony.

Following the close of evidence, the trial court granted the City's motions for direct-ed verdict and, thus, effectively dismissed the City from the case. Hence, the jury was instructed only as to the negligence count against Appellant. Additionally, the trial court refused to submit Appellant's proposed comparative fault and spoliation instructions to the jury.

Ultimately, the jury returned a $109,025.31 verdict in favor of Respondent. The trial court entered its judgment accordingly and denied Appellant's subsequent motion for judgment notwithstanding the verdict ("JNOV"). Appellant now raises five points of error on appeal.

In its first point, Appellant contends that the trial court erred in admitting Greathouse's testimony regarding his phone conversations with Adams under the excited utterance exception to the hearsay rule. In determining whether a statement constitutes an excited utterance, courts must consider "(1) the time between the startling event and the declaration, (2) whether the declaration is in response to a question, (3) whether the declaration is self-serving, and (4) the declarant's physical and mental condition at the time of the declaration." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). "The essential test for admissibility of a spontaneous statement or excited utterance is neither the time nor place of its utterance but whether it was made under such circumstances as to indicate it is trustworthy." *Id.* (internal quotation omitted).

Over Appellant's objections, Greathouse was permitted to testify about three or four phone conversations he had with Adams over the course of Adams discovering the Freight House Lofts basement had flooded. Greathouse testified that, during the first phone call, Adams informed him of a substantial amount of water coming out of a pipe on the side of the Freight House Lofts building. Greathouse further

testified that after Adams went into the basement, Adams called Greathouse back and told him that the whole basement had water in it. Greathouse explained that he guided Adams through the basement, asking him how deep the water was and if it had gone past the elevator. Greathouse then testified that Adams called him again upon entering the room where the water meter is located and told him there was a lot of water in the room. Greathouse testified that he told Adams, "You will be safe. Just walk over there. Tell me what you see." In response, Adams told him it looked like the water meter is leaking and that Adams thought "the gasket ha[d] exploded on it or come apart because water [was] shooting out the flange." He further stated that Adams described the water meter as leaking from the right side. Greathouse testified that he then informed Adams to shut the water off and that Adams called him back to inform him that the water had been shut-off. Greathouse also testified that he would describe the incident as an emergency situation and that Adams seemed excited during the phone calls.

Appellant contends that Adams's statements do not fall within the excited utterance exception to the hearsay rule because Adams's statements lacked the requisite indicia of trustworthiness in that Adams's statements were self-serving and that Adams was not in position of sufficient mental or physical stress when he made the phone calls to Greathouse. Respondent contends that Adams had no self-serving reason to make such statements and that Adams was experiencing sufficient mental stress after discovering a substantial amount of water in the basement. Even assuming, *arguendo*, that Appellant is correct, and that the trial court erred in admitting Adams's statements under the excited utterance excep-

tion, "[t]he improper admission of hearsay evidence requires reversal [only] if such evidence is prejudicial." *Saint Louis Univ. v. Geary*, 321 S.W.3d 282, 291 (Mo. banc 2009). "A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence." *Id.* at 292 (internal quotation omitted). "Cumulative evidence is additional evidence that reiterates the same point." *Id.* In light of other evidence in the case, Adams's statements were cumulative and were not prejudicial.

Appellant avers that Greathouse's hearsay testimony was prejudicial because it was the only evidence of the source of the water contemporaneous with the flooding. Eden's testimony, however, reiterated the same point. Eden arrived at Freight House Lofts forty minutes after receiving the call that the basement had flooded. Eden testified that when he barely turned the water back on, water began shooting out of the flange on the right side of the meter. Eden, therefore, observed and testified to the source of the water leak on the day of the flood soon after the leak was discovered.

In addition to Eden's testimony, the ticket Eden wrote regarding the call to the Freight House Lofts basement also noted the source of the leak on the day the basement flooded. The ticket provided that the "[g]asket was blown out, supply side of domestic water meter, put gasket back and tightened the flange." Thus, Eden's testimony and ticket both identified and reiterated that the water meter was the source of the leaking water on the day the flooding occurred. Accordingly, even if Greathouse's testimony regarding Adams's statements was inadmissible under the excited utterance exception, such testimony was harmless, as it amounted to cumulative evidence, the admission of

which had no prejudicial effect on Appellant. Point denied.

In its second point, Appellant contends that the trial court erred in refusing to give its proposed comparative fault, failure to mitigate, and apportionment of fault instructions to the jury because the evidence adduced at trial supported the submission of such instructions. "When a party claims that the trial court erroneously refused to submit an instruction to which [it] claims [it] was entitled, we review the trial court's refusal to submit the instruction for abuse of discretion." *McCullough v. Commerce Bank*, 349 S.W.3d 389, 396 (Mo.App. W.D.2011) (internal quotation omitted). "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (internal quotation omitted).

Appellant first asserts that it was entitled to a comparative fault instruction because there was substantial evidence in the record from which a jury could find Respondent partially responsible for causing the basement to flood. "If there is evidence from which a jury could find that plaintiff's conduct contributed to cause some of the damages the plaintiff sustained, the parties to a negligence action are entitled to have the jury instructed under comparative fault principles." *Walley v. La Plata Volunteer Fire Dep't*, 368 S.W.3d 224, 229 (Mo.App. W.D.2012). All evidence and inferences therefrom are viewed in the light most favorable to the submission of the instruction. *Benedict v. N. Pipeline Const.*, 44 S.W.3d 410, 423 (Mo.App. W.D.2001). Nevertheless, a comparative fault instruction "must be supported by substantial evidence and *cannot be supported by mere speculation or conjecture.*" *Id.* (emphasis added).

Appellant contends Respondent could be found comparatively at fault because there is substantial evidence in the record that "Respondent's plumbing equipment was less than optimal, and the technicians were not properly trained." Appellant's contentions, however, are based solely on speculation and conjecture. Appellant bases its assertion that Respondent's plumbing equipment was less than optimal on testimony that Respondent's maintenance technicians had been instructed to monitor the water meter because it had been leaking. Evidence regarding the leaky meter, however, pertained to the meter *before* it was replaced. There was no testimony regarding the condition of Respondent's plumbing equipment at the time of the flood. Furthermore, Appellant provides no citation to any testimony in the record indicating that Adams or the other Freight House Lofts maintenance technicians were not properly trained. In fact, no evidence was introduced at trial regarding the training, or lack thereof, of Respondent's maintenance technicians. Rather, Appellant relies solely on the fact that Adams did not know where the water was coming from to speculate that he must have been poorly trained. Accordingly, Appellant failed to identify any substantial evidence in the record that would support the submission of a comparative fault instruction.

Additionally, to the extent that Appellant contends the trial court erred in refusing to give an instruction that would permit jurors to apportion fault to the City, Missouri courts have long held that "fault is to be apportioned [only] among those at trial." *Kansas City Power & Light v. Bibb & Assoc., Inc.*, 197 S.W.3d 147, 159 (Mo.App. W.D.2006); *see also Jensen v. ARA Servs., Inc.*, 736 S.W.2d 374, 377 (Mo. banc 1987) (explaining that

"[i]n Missouri ... fault is only to be apportioned among those at trial and Missouri courts have rejected invitations to change to a total fault apportionment"). At the time the jury instructions were given, the City was no longer involved in the trial because the trial court had granted the City's motions for directed verdict. Thus, the City was no longer a party to the case, and no fault could be apportioned to it. The trial court, therefore, did not err in refusing to give an apportionment of fault instruction with respect to the City. Point denied.

 In its third point, Appellant contends that the trial court erred in refusing to give spoliation instructions because Respondent admittedly allowed the destruction of evidence and failed to produce other evidence in that it allowed the gasket at issue to be taken and destroyed by the City and failed to locate and produce the maintenance records and access logs for the Freight House Lofts.[2] The spoliation instruction Appellant requested was not an MAI instruction. We review the trial court's refusal to submit a non-MAI instruction for abuse of discretion. *McCullough*, 349 S.W.3d at 396. A trial court abuses its discretion when its "ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 397 (internal quotation omitted). We "will not reverse a verdict due to instructional error, including the refusal to give an instruction, unless the error is prejudicial, materially affecting the merits of the action." *Id.* (internal quotation omitted).

 Missouri courts have long recognized the doctrine of spoliation. *Baldridge v. Dir. of Revenue*, 82 S.W.3d 212, 222 (Mo.App. W.D.2002). The doctrine of spoliation pertains to "the destruction or significant alteration of evidence." *Id.* (internal quotation omitted). When a party intentionally spoliates evidence, that party is subject to an adverse evidentiary inference. *Zahner v. Dir. of Revenue*, 348 S.W.3d 97, 101 (Mo.App. W.D.2011). Although the destruction of written evidence without satisfactory explanation can give rise to an adverse inference against the spoliator, a spoliation instruction will not be given unless "there is evidence of an intentional destruction of the evidence indicating fraud and a desire to suppress the truth." *Baldridge*, 82 S.W.3d at 223 (internal quotation omitted). "Simple negligence ... is not sufficient to apply the adverse inference rule." *Id.* (internal quotation omitted).

Appellant contends Respondent's failure to produce the maintenance and access logs for the Freight House Lofts as well as the destruction of the gaskets that were replaced on the water meter entitle it to a spoliation instruction. Appellant emphasizes that "Respondent had no satisfactory explanation for the destruction of the water meter gaskets or [its] failure to produce the maintenance and access logs for the building." But, as testimony elicited at trial indicated, the meter was City property, and Respondent had no control over what the City did with its property, including the gaskets, upon removal. Furthermore, Appellant presented no evidence that Respondent intentionally destroyed the maintenance and access logs to the Freight House Lofts. Instead, Appellant relies solely on the fact that Respondent

---

2. Appellant requested production of Respondent's maintenance records and access logs for the Freight House Lofts. Respondent replied, in effect, that it did not have or could not locate the maintenance records or access logs. From the record, it appears Appellant took no further action on the subject until it requested the spoliation instruction.

could not produce the logs as evidence that Respondent must have intentionally destroyed or withheld them. The failure to produce such evidence, in and of itself, is not sufficient to warrant a spoliation instruction. Accordingly, the trial court did not err in refusing to submit a spoliation instruction to the jury. Point denied.

■ In its fourth point, Appellant asserts that the trial court erred in admitting the testimony of Robert Webster, Respondent's expert witness, because the testimony invaded the purview of the jury in that it was speculative, provided no standard of care, and did not assist the jury with scientific, technical, or other specialized knowledge. Section 490.065 controls the admission and exclusion of expert testimony in Missouri civil cases. *Kivland v. Columbia Orthopaedic Grp., LLP,* 331 S.W.3d 299, 310 (Mo. banc 2011). Pursuant to § 490.065, a trial court must determine whether "(1) the expert is qualified; (2) the expert's testimony will assist the trier of fact; (3) the expert's testimony is based upon facts or data that are reasonably relied on by experts in the field; and (4) the facts or data on which the expert relies are otherwise reasonably reliable." *Id.* at 311.

■ Appellant's contentions regarding the admissibility of Webster's testimony stem from the fact that Webster had no first-hand knowledge regarding the leaking water meter but instead formed his expert opinion based upon descriptions of the event found in other witnesses' depositions. Section 490.065.3, however, expressly provides that "[t]he facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing...." "Merely because an expert relied on information and opinions of others does not automatically disqualify his testimony." *Byers v. Cheng,*

238 S.W.3d 717, 729 (Mo.App. E.D.2007) (internal quotation omitted). "[A]n expert may base his opinion on facts and data derived from sources outside of court and other than by his own perceptions." *Lau v. Pugh,* 299 S.W.3d 740, 755 (Mo.App. S.D.2009). In fact, Missouri courts have noted that "[e]xpert opinion testimony is usually based upon facts that the expert did not personally observe or of which the witness has no personal knowledge." *Eagan v. Duello,* 173 S.W.3d 341, 350 (Mo. App. W.D.2005). Therefore, the fact that Webster relied on the depositions of other witnesses in forming his expert opinion in no way affected the admissibility of his testimony but rather goes to the jury's assessment of Webster's credibility and the weight to be given to his testimony. *See Mathes v. Sher Express, L.L.C.,* 200 S.W.3d 97, 111 (Mo.App. W.D.2006) (explaining that "[a]ny weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility") (internal quotation omitted).

■ Appellant further asserts that Webster's testimony was inadmissible because it boiled down to testimony that "the bolts were not tightened down sufficiently" and, thus, was of no assistance to the jury. Generally, expert testimony is admissible as long as the expert's competence on the subject matter is superior to that of the ordinary juror and the expert's opinion aids the jury in deciding an issue in the case. *Westerman v. Shogren,* 392 S.W.3d 465, 473–74 (Mo.App. W.D.2012). Webster testified that he was a professional engineer, that he had been in the plumbing business for fifteen years, and had experience installing residential and commercial water meters. He further explained the concept of torque loss to the jury and relayed an incident from his personal ex-

perience about how a water meter can leak when its bolts are not tightened in excess. He further testified that, prior to trial, he had researched Neptune T–10 water meters and provided further testimony as to the proper manner for installing that type of meter. After reviewing the substance of Webster's testimony, we cannot say that it provided no aid or assistance to the jury in determining the issues presented in this case. Thus, the trial court did not err in admitting Webster's expert testimony. Point denied.

 In his fifth point, Appellant asserts that the trial court erred in denying its JNOV motion because the jury verdict was against the manifest weight of the evidence in that Respondent failed to establish an applicable standard of care and failed to show that any action of Appellant was the cause-in-fact or the proximate cause of the leak and subsequent flood. "A defendant is entitled to [a JNOV] only when the plaintiff fails to make a submissible case." *Anderson v. Parker*, 351 S.W.3d 827, 831 (Mo.App. W.D.2011). Thus, we review the denial of a JNOV motion "to determine whether the plaintiff has made a submissible case." *Lewis v. Biegel*, 364 S.W.3d 670, 675 (Mo.App. W.D. 2012) (internal quotation omitted). A plaintiff makes a submissible case when he or she presents "substantial evidence for every fact essential to liability." *Anderson*, 351 S.W.3d at 831. Substantial evidence consists of evidence that "if true, has probative force upon the issues and from which the trier of fact can reasonably decide the case." *Id.* (internal quotation omitted).

 Furthermore, "[w]e view the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inference and disregarding evidence and inferences that conflict with that verdict."

*Lewis*, 364 S.W.3d at 675 (internal quotation omitted). "The plaintiff's evidence is presumed to be true, and the defendant's evidence that does not support the plaintiff's case is disregarded." *Anderson*, 351 S.W.3d at 831. Nonetheless, we "will not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences." *Id.*

 To make a submissible negligence case, "a plaintiff must establish: (1) a duty in the defendant to protect the plaintiff from injury; (2) the failure by a defendant to perform that duty; and (3) the defendant's failure proximately caused injury to the plaintiff." *Butts v. Express Personnel Servs.*, 73 S.W.3d 825, 835 (Mo.App. S.D. 2002). Appellant challenges the submissibility of Respondent's negligence claim on two grounds: (1) standard of care and (2) causation.

 First, Appellant contends that Respondent failed to make a submissible negligence case because Respondent's expert did not articulate the applicable standard of care for installing a water meter. When offering expert testimony as to the standard of care, the jury must be informed whether the witness " 'is using the standard prescribed by law and not some other standard.' " *Lake v. McCollum*, 295 S.W.3d 529, 533 (Mo.App. W.D.2009) (quoting *Ladish v. Gordon*, 879 S.W.2d 623, 634 (Mo.App. W.D.1994)). "It is not necessary that the legal standard be recited in ritualistic fashion, but generally it must appear somewhere in the context of the expert's testimony that the proper objective legal standard is the standard being employed by this expert in his or her testimony." *Id.* (internal quotation omitted). The standard of care "on which the expert relies must be objective, that is, not merely the personal opinion of the expert, but the standard that is accepted generally in the

profession." *Id.* (internal quotation omitted).

■ Appellant contends that Webster failed to testify as to the standard of care for proper installation of a water meter. In doing so, Appellant avers that Webster did not articulate a standard of care that "established the degree of skill and learning ordinarily used under the same or similar circumstances by plumbers in installing a water meter." We disagree.

Webster testified that the standard of care in the industry for installing a gasket for a Neptune T–10 water meter was to "[m]ake sure you place the gasket properly, in proper alignment, and tighten the bolts down to a point well in excess of what it would take to keep it watertight. You would certainly not modify the gasket in any way." He further testified that the installation of a water meter with a cut gasket and loose bolts by the installer falls below the industry's standard of care. While Appellant contends such testimony was insufficient to establish the requisite standard of care in this case, the Missouri Supreme Court found that similar testimony by an expert in *Hickman v. Branson Ear, Nose & Throat, Inc.*, 256 S.W.3d 120, 123 (Mo. banc 2008), sufficiently established the applicable standard of care in a medical malpractice case.

In *Hickman*, an expert testified that the "[t]otal thyroidectomy [was] the proper procedure for what [the plaintiff's] diagnosis was" and that leaving a lobe of the thyroid when you are required to do a total thyroidectomy does not meet the standard of care for a surgeon. *Id.* at 123–24. On appeal, the defendant argued that the expert failed to give testimony adequately describing and defining the phrase standard of care so that the jury could be properly informed of the meaning of the phrase. *Id.* at 122. In finding that there was sufficient evidence as to the standard of care, the Missouri Supreme Court stated that although the expert's testimony did not follow the precisely formulated words in negligence instruction, the issue was "whether the substance of the answers to the questions provided the jury with an explanation of the standard of care." *Id.* at 123. The Court explained that even though the expert's testimony was specifically tailored to the facts of the case, such testimony sufficiently set forth the applicable standard of care in that it explained what the proper procedure was and that the doctor's failure to remove a lobe during that procedure fell below the standard of care for surgeons. *Id.* at 124.

Like the expert's testimony in *Hickman*, Webster's testimony sufficiently explained the applicable standard of care in this case. Webster's testimony did not conform precisely to the formulated words used in the negligence instruction.[3] The substance of Webster's testimony, however, clearly set forth what a plumber in the industry should have done to properly install a Neptune T–10 water meter. Thus, although specifically tailored to the facts of the case, Webster's testimony provided the jury with a sufficient explanation as to what the standard of care in the plumbing industry is for installing a water meter. Accordingly, Webster testimony sufficiently articulated the requisite standard of care to the jury in this case.

■ Appellant next asserts that Respondent failed to establish that Appellant's negligent installation of the water

---

3. The jury was provided with the following language regarding the applicable standard of care: "The term 'negligent' or 'negligence' as used in these instructions means the failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances."

meter was the actual and proximate cause of Respondent's flooded basement. "To establish a causal connection between the alleged negligent act and injury, the plaintiff must show both causation in fact and proximate cause." *Payne v. City of St. Joseph,* 135 S.W.3d 444, 450 (Mo.App. W.D.2004). Missouri courts apply the "but for" test to determine whether causation in fact has been established. *Id.* "The 'but for' test for causation provides that the defendant's conduct is a cause of the event if the event would not have occurred 'but for' that conduct." *Id.* "Causation in fact is an issue for the jury if sufficient evidence is presented from which the jury could reasonably find that the plaintiff's injury was a direct result of the defendant's negligence." *Id.* The test for establishing proximate cause "is whether the negligence is an efficient cause which sets in motion the chain of circumstances leading to the plaintiff's injuries or damages." *Id.* at 450–51 (internal quotation omitted). "A submissible case is made on th[e] issue [of proximate cause] if substantial evidence is presented that shows the injury is a natural and probable consequence of a defendant's negligence." *Butts,* 73 S.W.3d at 837.

In establishing whether a submissible case has been made on the basis of causation, it is important to note that "[a]bsolute certainty is not required to prove a causal connection between the defendant's actions and plaintiff's injury." *Id.* "It is wholly permissible for the jury to infer causation from [the] circumstances." *Id.* "If the logical conclusion from the evidence is that if certain things had been done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient." *Id.* (internal quotation omitted).

Here, viewing the evidence in the light most favorable to the verdict, there is substantial, circumstantial evidence of a causal connection between Appellant's installation of the water meter and the subsequent flooding of Respondent's basement. Appellant installed a new meter in Respondent's basement on September 1, 2009. White testified that there was no record of any City employee performing maintenance of any kind on the water meter in Respondent's basement between September 1, 2009, and October 18, 2009, when the flood occurred. Eden testified that when he turned the water back on, the water came shooting from the flange of the water meter. He further testified that the bolts holding the flange in place were not as tight as they should have been and that the gasket had been cut. Respondent's expert opined that, due to torque loss, the failure to tighten the bolts in excess can result in a water meter leaking. He further testified that failing to tighten the bolts to the point of excess and installing a cut gasket fell below the standard of care for installing water meters in the plumbing industry. From such evidence, the jury could have logically concluded that Appellant negligently installed the water meter, the natural and probable consequence of which was Respondent's basement flooding. Thus, Respondent made a submissible case with respect to causation. Accordingly, the trial court did not err in denying Appellant's motion for JNOV. Point denied.

Judgment affirmed.

All concur.