Roger HICKMAN and Carla
Hickman, Respondents,

v.

BRANSON EAR, NOSE & THROAT,
INC., Appellant.

No. SC 88887.

Supreme Court of Missouri,
En Banc.

June 30, 2008.

Susan Ford Robertson, Ford, Parshall &
Baker, Columbia, Bruce E. Hunt, Joel A.
Block, Springfield, for appellant.

Steven B. Garner, Rachel M. Dockery,
Strong, Garner, Bauer, P.C., Springfield,
for respondents.

MICHAEL A. WOLFF, Judge.

### Introduction

Branson Ear, Nose & Throat, Inc. was
found liable to Roger and Carla Hickman
as a result of the alleged negligence of one
of its physicians, Dr. Michael Bays, D.O.,
who performed surgery to remove Roger
Hickman's thyroid gland.

The sole issue on this appeal is whether
the Hickmans' expert witness, Dr. Paul
Nelson, M.D., established the standard of
care so that the jury could properly deter-
mine whether Dr. Bays breached the stan-
dard of care and was thereby negligent.

### Facts

Roger Hickman went to see a general
practitioner in April 2001 for a general
checkup and physical examination. Dur-
ing the examination the practitioner felt
Hickman's throat and ordered an ultra-
sound and a CT scan of the thyroid. The
ultrasound showed that there were abnor-
malities in the left and right thyroid lobes.
The CT scan showed a large calcified mass
about the size of a full. thyroid lobe grow-
ing off the lower right segment of the
thyroid. The general practitioner referred
Hickman to Dr. Bays of Branson Ear,
Nose & Throat, Inc.

Dr. Bays ordered an ultrasound, which confirmed the earlier findings. He performed a biopsy on the thyroid, the results of which were nonspecific, and, therefore, Dr. Bays recommended surgery. Dr. Bays' plan was to remove the right thyroid lobe, have tissue examined, and, if cancer were determined to be present, perform a total thyroidectomy. A total thyroidectomy involves removing all visible thyroid tissue.

Dr. Bays performed the surgery at Skaggs Health System, Inc., a hospital in Branson. During the surgery, a frozen section of thyroid tissue was analyzed and determined to be cancerous. Dr. Bays' medical report says that he then performed a total thyroidectomy, removing the right and left lobes. He told the Hickmans that he had removed the entire thyroid.

After the surgery, Dr. Bays referred Roger Hickman to an endocrinologist for further evaluation and treatment. The endocrinologist expected that Hickman's thyroid hormone level would be nonexistent because of the removal of the thyroid. At the same time, the patient's thyroid-stimulating hormone level was expected to rise dramatically because the body recognizes a lack of thyroid and produces an excess of the hormone that stimulates thyroid production. The test performed on Roger Hickman, however, found that his thyroid levels were basically normal, did not decrease, and his thyroid-stimulating hormone levels did not increase as expected following a total thyroidectomy. The endocrinologist ordered an ultrasound. The ultrasound showed that Hickman's left thyroid lobe had been removed, but that his right thyroid gland was still present in its entirety although the mass or tumor was no longer attached to it. The ultrasound also showed that the nodules that existed in the right thyroid before Hickman's surgery were still present. The

amount of right thyroid tissue that remained prevented effective radioablation— a radioactive iodine therapy intended to kill any remaining microscopic cancerous cells.

The endocrinologist recommended further surgery and referred Roger Hickman to a thyroid surgeon in Springfield. The surgeon reviewed post-surgery ultrasounds and determined that Hickman needed to have a second surgery to remove the right thyroid that had been left in his body during the first surgery. The Springfield surgeon referred Hickman to a thyroid surgeon in St. Louis, who agreed with the Springfield doctor that a second surgery should be performed to remove the right thyroid. This second surgery would make it possible for him to undergo post-surgical radioactive iodine treatment to reduce or eliminate the cancer risk.

In April 2002, Hickman underwent a second surgery in St. Louis in which 8.2 grams of thyroid tissue, which measured 4 centimeters by 2.5 centimeters by 2 centimeters, was removed. This was about the size of the right thyroid lobe. Subsequent testing of the thyroid tissue that was removed in the second surgery showed that it was cancer-free.

Following the second surgery Roger Hickman's voice was dramatically different. Hickman had been a music minister who wrote and recorded gospel music. He found that he had a significantly reduced vocal range and no endurance for singing. He no longer was able to sing commercially, record music, or work as a full-time music minister.

The Hickmans filed suit against Dr. Bays, Branson Ear, Nose & Throat, and the Skaggs Health System in May 2003. After dismissing their claims against Dr. Bays without prejudice and the Skaggs Health System with prejudice, the Hickmans' case went to trial in January 2006

against Branson Ear, Nose & Throat, Inc., for the alleged negligence of Dr. Bays.

After the trial court overruled the motion for directed verdict, defendant Branson Ear, Nose & Throat rested without presenting evidence. The case was submitted to the jury, which returned a verdict for Roger Hickman in the amount of $299,644.97. The jury also rendered a verdict of $10,000 damages in favor of Carla Hickman for loss of consortium. The trial court entered judgment on the jury verdicts and overruled the motion for judgment notwithstanding the verdict. Branson Ear, Nose & Throat appealed.

Following opinion in the court of appeals, this Court granted transfer. This Court has jurisdiction. Mo. Const. Art. V, sec. 10.

### The Issue on Appeal

Branson Ear, Nose & Throat, Inc. raises a single issue: that the Hickmans failed to elicit expert testimony describing and defining the phrase "standard of care" so that the jury could be properly informed of the meaning of the phrase. As a result of this failure, Branson Ear, Nose & Throat contends that the Hickmans failed to make a submissible case.

### Analysis

■ At its best, the questioning of an expert witness on the elements of a negligence case is akin to the performance of a beautiful song. The law provides the "lyrics"—standard of care, its breach, and causation—and the individual lawyer's nuance

of expression and organization provide the "music." An effective performance needs not just great music, but the right lyrics.

The words of MAI 11.06, with which the trial court instructed the jury, are not particularly lyrical, but their meaning must be conveyed. Medical negligence, the instruction says, is "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession." For examples, *see generally McLaughlin v. Griffith*, 220 S.W.3d 319 (Mo.App.2007); *Ladish v. Gordon*, 879 S.W.2d 623, 628 (Mo.App.1994). This instruction, which sets forth the legal standard, provides a basis for questioning the Hickmans' expert as to the standard of care and how that standard was breached by the defendant's surgeon.

An attorney could avoid the legal issue presented here by asking questions phrased exactly in the words of the legal definition. This would be a safe approach and highly satisfying to appellate judges who review for legal error.[1] But, as a way of asking questions that holds the jury's interest, the legal definition perhaps does seem tedious, and, thus, to lack the touch of the virtuoso.

Expert testimony has been the subject of formulaic requirements in the past. For instance, the law prior to 1989 required that an expert such as Dr. Nelson—who has no direct knowledge of the events in suit—be asked a hypothetical question. *Harp v. Illinois Cent. R. Co.*, 370 S.W.2d 387, 391 (Mo.1963) (citing *Schears v. Missouri Pacific Railroad*

---

1. At oral argument, the Hickman's attorney acknowledged that the safe approach would be a general statement, as part of a question, near the beginning of the expert's testimony that would go something like this: Doctor, I want an agreement that as we go through your testimony, when you voice an opinion, it is to a reasonable degree of medical certainty, and if I use the phrase or you use the phrase "standard of care" that means that degree of skilled and learning ordinarily used under the same or similar circumstances by members of your profession. *See also*, FRED LANE, GOLDSTEIN TRIAL TECHNIQUES [Sec.] 15:32 (3d ed. 1984) ("Standard of care—proof of violation and proximate cause" Illustration).

*Company,* 355 S.W.2d 314 (Mo.1962)). This kind of question followed a formula requiring the proponent of the expert testimony to hypothesize all the material facts upon which the expert's opinion was to be based. *Id.* The question was usually long and, unless the questioner was particularly skillful, hard to follow or simply boring.

Section 490.165, enacted in 1989, eliminated the hypothetical question requirement.[2] Although the statute allows the judge to require a hypothetical question if it would "make the expert's opinion more understandable," the statute seems to have discouraged the use of the hypothetical question. William Schroeder, 33 Mo. Prac., Courtroom Handbook on Mo. Evid. [Sec.] 705.1 (2008 ed.); *see generally, State Bd. of Registration for the Healing Arts v. McDonagh,* 123 S.W.3d 146, 160 (Wolff, J.) (Mo. banc 2003). The influence of section 490.165 has undoubtedly made the questioning of experts simpler, more direct, and less formulaic than in the past.

But this change to a simpler approach has not eliminated the need for the expert testimony to explain to the jury what the standard of care is and how the defendant violated the standard.

The Hickmans' theory of ultimate facts proving negligence is that Dr. Bays' failure to perform a total thyroidectomy—which is defined as the removal of all visible thyroid tissue—was negligent. The testimony of Dr. Nelson, the expert witness employed by the Hickmans, was that Dr. Bays did fail to perform a total thyroidectomy, that the treatment was indicated for a patient of Roger Hickman's age who had a cancerous thyroid, and that this failure violated the standard of care. There is no issue raised here as to whether the negligence, as found by the jury, caused injury to Roger Hickman.

The attorney's questions, and the responses of the Hickmans' expert, did not follow the precisely formulated words of MAI instruction 11.06. The issue, however, is whether the substance of the answers to the questions provided the jury with an explanation of the standard of care. Dr. Nelson, the expert for the Hickmans, testified:

Q. All right. Let me ask you, sir, do you have an opinion about whether Roger Hickman given his clinical history and findings needed to have a total thyroidectomy?

A. Yes. Total thyroidectomy is the proper procedure for what Mr. Hickman's diagnosis was.

Q. Do you have an opinion about whether or not Dr. Bays performed a total thyroidectomy December 7, 2001?

A. He did not.

Q. Do you have an opinion, sir, whether given that failure, the subsequent surgery that was undertaken by Dr. Moley in St. Louis was needed and necessary?

A. Yes, it was necessary.

Q. All right. Now, do you have an opinion about whether there was a total thyroidectomy that was actually done? You indicated the records indicate that that's what was intended. Was it done?

A. No. The patient had most of this right side still left in after the surgery.

Q. And why do you say that?

A. Oh, well, there are several scans that are done in the time between the two operations that show it still there; and then at the second surgery that was done in St. Louis, it was still there.

Q. Now, Doctor, if you are required to do a total thyroidectomy, based upon the findings of cancer like you've described,

2. Unless otherwise noted, all statutory references are to RSMo 2000.

and you leave one lobe of the thyroid, does that meet the standard of care for a surgeon?

A. No.

Q. Why does it not?

A. Well, if you—if you go to take out a whole thing and you leave half the thing in, that's not what you are supposed to do.

Q. Um, as you teach these students on how to do these surgeries, have you ever taught them that it is appropriate to leave half a lobe or half of a thyroid when you . . .

A. No.

The foregoing is not the entirety of Dr. Nelson's testimony on the subject of medical negligence, but it is enough to consider whether the expert sufficiently set forth the standard of care to which Dr. Bays was to be held.

■ To make a submissible case, the Hickmans needed to introduce evidence that Dr. Bays—in the words of MAI 11.06, which was given as Instruction No. 6 in this case—"failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession." *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995). The standard must be objective, that is, not merely the personal opinion of the expert, but the standard that is accepted generally in the profession. *Swope v. Printz*, 468 S.W.2d 34 (Mo. banc 1971).

The standard of care was expressed in Dr. Nelson's testimony, quoted above, that "total thyroidectomy is the proper procedure for what Mr. Hickman's diagnosis was," and that leaving one lobe of the thyroid does not meet the standard of care for a surgeon. The opinion was not a vague reference to "that degree of skill and learning ordinarily used under the

same or similar circumstances by members of the defendant's profession." The expert's opinion was, rather, specific to what a thyroid surgeon should do who is performing this specific operation, a thyroidectomy, for the specific reason he was doing it. Moreover, there appears to be no real dispute between the testimony of Dr. Nelson, the Hickman's expert, and Dr. Bays as to the proper standard. Dr. Bays acknowledged that if a surgeon thinks he removed the thyroid but left it, such conduct would "definitely" be a mistake, would be surgical error, and would violate his duties as a surgeon. With or without Dr. Bays' acknowledgement of the standard, Dr. Nelson's specific testimony met the requirement of explaining the standard of care that is set forth generally in MAI 11.06.

## Conclusion

There was sufficient evidence as to the standard of care from which the jury could conclude, as it did, that Dr. Bays was negligent and that, therefore, Branson Ear, Nose & Throat was liable to the Hickmans for the damages the jury found.

The judgment of the circuit court is affirmed.

All concur.