**Joe Bob LAKE, Appellant,**

v.

**Frank B.W. MCCOLLUM, Respondent.**

**No. WD 66670.**

Missouri Court of Appeals,
Western District.

July 31, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 22, 2009.

Application for Transfer Denied
Nov. 17, 2009.

Michael W. Lerner, Overland Park, KS, for appellant.

Michael D. Moeller, and Michael J. Kleffner, Kansas City, MO, for respondent.

Before ALOK AHUJA, P.J., THOMAS H. NEWTON, C.J., and HAROLD L. LOWENSTEIN, J.

ALOK AHUJA, Judge.

Appellant Joe Bob Lake appeals the trial court's grant of judgment notwithstanding the verdict ("JNOV") in favor of Dr. Sharon Prohaska after a jury found in Lake's favor in this medical malpractice action. We reverse and remand for entry of judgment on the jury's verdict.

## Facts

On June 28, 1999, while experiencing a severe migraine headache, Julia Lake visited her regular physician, Dr. Prohaska, at her medical office in Kansas City. During the visit, an injection consisting of a combination of the drugs Nubain and Vistaril was administered to attempt to alleviate Julia's migraine pain. After receiving the shot, Julia experienced convulsions and fainted in the restroom at Dr. Prohaska's office. Lake alleged that Julia struck her right shoulder on the bathroom sink during this syncopal episode,[1] and that the

---

1. Lake's medical expert, Dr. Rushing, explained that a syncopal episode is "a fainting or a loss of consciousness."

impact caused severe injury to her shoulder.

Following the incident, Julia and her husband, Joe Bob Lake (collectively "Lake"), sued Dr. Prohaska for medical malpractice. Lake contended that Dr. Prohaska's authorization of the administration of Nubain and Vistaril on June 28, 1999, constituted malpractice because of Julia's previous, severe adverse reaction to that precise combination of drugs (at lower doses) just a few months earlier, in March 1999. After suffering the earlier adverse reaction, Julia instructed Dr. Prohaska and her office staff, both by telephone and in person, never to administer that combination of medications to her again. Julia also demanded that her medical chart be annotated accordingly. Lake alleged that Dr. Prohaska committed malpractice by authorizing the administration of the injection containing the same medications on June 28, despite Julia's previous, adverse reaction and her specific instructions.

Julia Lake died as a result of other illnesses prior to trial. Joe Bob Lake was substituted for Julia, as the personal representative of her estate; as a co-plaintiff in his personal capacity, Joe Bob also asserted his own claim for loss of consortium.

The case was tried to a jury over two weeks. Dr. Prohaska moved for directed verdict at the close of Lake's evidence and again at the close of all the evidence. The trial court deferred ruling on both motions. Following its deliberations, the jury returned a verdict in Lake's favor in the amount of $125,000: $100,000 to Julia's estate for non-economic damages, and $25,000 to Joe Bob in his individual capacity on his consortium claim. The jury made no award to Lake for the medical expenses he had sought to recover.

Dr. Prohaska subsequently filed a motion for judgment notwithstanding the verdict ("JNOV"), which alleged two grounds for entry of judgment in her favor: (1) that Lake had "failed to define the applicable standard of care in his questioning of [Lake's medical expert] Dr. [Elijah D.] Rushing[, Jr.], as required by *Ladish v. Gordon*, 879 S.W.2d 623 (Mo.App. W.D. 1994);" and (2) that Lake had failed to present evidence to support a jury finding that he "sustained non-economic damages as a direct result of Dr. Prohaska's alleged negligence." The trial court ultimately granted Dr. Prohaska's motion, finding in her favor on both grounds.

Lake appealed the trial court's JNOV ruling to this Court. Dr. Prohaska died while the case was pending here, and Lake's appeal was stayed. By order of this Court, Lake was given ninety days to file a motion to substitute Dr. Prohaska's estate for Dr. Prohaska personally. Lake filed such a motion; we dismissed his appeal, however, because the personal representative he named did not reside in Missouri, and we concluded that we lacked jurisdiction over the named individual.

The Missouri Supreme Court granted transfer. The Supreme Court granted Lake's motion to substitute Frank B.W. McCollum as Dr. Prohaska's personal representative. (Unless the context requires otherwise, we refer to Dr. Prohaska and her personal representative interchangeably as "Dr. Prohaska.") The Court also held, contrary to Lake's arguments, that Dr. Prohaska's JNOV motion was timely filed. *Lake v. McCollum*, 257 S.W.3d 614, 616 (Mo. banc 2008). The Supreme Court retransferred the case to this Court with the direction that we "review the underlying merits of the circuit court's final judgment." *Id.*

### Analysis

Lake contends that the trial court erred in granting Dr. Prohaska's JNOV motion

because Lake's medical expert properly defined the applicable standard of care, and he presented sufficient evidence from which the jury could find that Dr. Prohaska's negligence proximately caused Lake's noneconomic damages. We agree.[2]

■■■■ We will affirm the trial court's grant of a JNOV "only if the plaintiff failed to make a submissible case." *Laws v. St. Luke's Hosp.*, 218 S.W.3d 461, 466 (Mo. App. W.D.2007). "In determining whether plaintiff made a submissible case against defendant, the reviewing court views the evidence in the light most favorable to plaintiff, giving plaintiff the benefit of all favorable evidence and reasonable inferences drawn therefrom, and disregards all contrary evidence." *Id.* (quotation omitted). To make a submissible case of medical malpractice, a plaintiff must establish that: "(1) an act or omission of the defendant failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently; and (3) the act or omission caused the plaintiff's injury." *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 554 (Mo. banc 2008); *see also Edgerton v. Morrison*, 280 S.W.3d 62, 68 (Mo. banc 2009). "There is a presumption favoring the reversal of a judgment

notwithstanding the verdict." *Laws*, 218 S.W.3d at 466. "The presumption is overcome where the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to differ as to the outcome." *Id.* (quotation omitted).

**I.**

At trial, Lake relied on the testimony of Dr. Elijah D. Rushing, Jr. to establish the applicable standard of care and Dr. Prohaska's negligence. The circuit court held that Dr. Rushing's testimony failed to adequately define the standard of care consistent with this Court's decision in *Ladish v. Gordon*, 879 S.W.2d 623 (Mo.App. W.D. 1994).

Under MAI 11.06,

> The term "negligent" or "negligence" as used [with respect to health care providers] means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession.

*See also, e.g., Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995).

---

**2.** Contrary to Supreme Court Rule 84.04(i), Lake's Statement of Facts fails to include specific page references to the legal file or transcript. The Argument section of his brief contains such record citations, however, and we therefore decline Dr. Prohaska's invitation to dismiss the appeal on the basis of this rule violation.

We also note that, during proceedings in the Supreme Court, Lake was advised by the Clerk to include in his briefing "all issues he wishes to raise regarding both the trial court and appellate proceedings." *See also* Rule 83.08(b) (specifying that substitute briefs in Supreme Court "shall include all claims the party desires this Court to review," "shall not incorporate by reference any material from the court of appeals brief," and that "[a]ny material included in the court of appeals brief

that is not included in the substitute brief is abandoned"). Despite the Clerk's specific admonition, and the provisions of Rule 83.08(b), Lake failed to argue in his Supreme Court brief that his evidence had made a submissible medical malpractice claim, and therefore that the JNOV granted Dr. Prohaska was erroneous on its merits. In these circumstances, an argument could be made that Lake abandoned his merits challenges to the JNOV ruling. The Supreme Court's opinion, however, clearly contemplates that we will address the merits of the arguments Lake originally sought to raise here. We also note that Dr. Prohaska's exhaustive briefing in this Court did not argue that Lake had waived his merits arguments, until we raised the issue at oral argument. We accordingly proceed to the merits of Lake's appellate arguments.

In *Ladish,* we reversed a plaintiff's verdict in a medical malpractice case because plaintiff's medical expert had failed to adequately define the standard of care he employed in opining that the defendant was negligent. We observed:

> The use of the terms "accepted medical standards" and "standards of care" do not in themselves satisfactorily articulate the appropriate legal standard. Care should be taken by counsel in every case, with every expert witness, to make sure the expert is properly oriented with regard to the meaning of the concept of negligence in the instance of a health care provider. It is not enough that the jury instruction [MAI 11.06] informs the jury of the meaning of negligence, or that some other witness testifies as to that witness' understanding of negligence in that context. It is necessary in each case that the fact finder be informed as to whether the witness, in offering opinions, is using the standard prescribed by law and not some other standard.
>
> ... It is not necessary that the legal standard be recited in ritualistic fashion, but generally it must appear somewhere in the context of the expert's testimony that the proper objective legal standard is the standard being employed by this expert in his or her testimony. Questions should not be propounded, or answered, in terms of "inadequately explored legal criteria." If attorneys and expert witnesses are allowed to become sloppy in the use of terms such as "accepted standards" and "standards of care" without specifying at some point in the witness' testimony the meaning of those terms, experts will inevitably tend to rely upon their own views of acceptable practice rather than applying the objective legal standard.

879 S.W.2d at 634–35 (citations omitted). In *Ladish,* the plaintiff's expert had stated his opinions in terms of what he characterized as "the usual approach," and what "might have been more appropriate" or "would be appropriate"; the expert also opined that the defendant had shown "poor judgment" and made "foolish" decisions. *Id.* at 629–32. Relying on the analysis quoted above, this Court held that the expression of opinions in these terms failed to establish the appropriate standard of care or the defendant's breach of that standard, and that the plaintiff had accordingly failed to make a submissible case. *Id.*

In *Hickman v. Branson Ear, Nose & Throat, Inc.,* 256 S.W.3d 120 (Mo. banc 2008), which was decided after the entry of JNOV in this case, the Supreme Court has recently clarified the level of specificity required of a plaintiff's expert in a medical malpractice case concerning the standard of care. *Hickman* observed that, while "[e]xpert testimony has been the subject of formulaic requirements in the past," more recently "the questioning of experts [has become] simpler, more direct, and less formulaic." *Id.* at 122–23; *see also Edgerton,* 280 S.W.3d at 66. Although the Court held that expert testimony need not parrot the legal definition of health care provider-negligence found in MAI 11.06, it emphasized that "this change to a simpler approach has not eliminated the need for the expert testimony to explain to the jury what the standard of care is and how the defendant violated the standard." *Hickman,* 256 S.W.3d at 123. Moreover, "[t]he standard [on which the expert relies] must be objective, that is, not merely the personal opinion of the expert, but the standard that is accepted generally in the profession." *Id.* at 124.

In *Hickman,* the Supreme Court found that "[t]he standard of care was expressed

in Dr. Nelson's testimony ... that 'total thyroidectomy is *the proper procedure* for what Mr. Hickman's diagnosis was,' and that leaving one lobe of the thyroid *does not meet the standard of care for a surgeon.*" 256 S.W.3d at 124 (emphasis added). While the expert's testimony "did not follow the precisely formulated words of MAI instruction 11.06," the Court held that "the substance of the answers to the questions provided the jury with an explanation of the standard of care." *Id.* at 123; *see also Edgerton,* 280 S.W.3d at 67 (recognizing that, in *Hickman,* "[the] substance of [the] expert's answers provided [the] jury with an explanation of the standard of care even though the technical legal standard was not stated verbatim"). Indeed, the Court suggested that the manner in which Dr. Nelson stated his opinions was in certain respects more informative than a rote repetition of the words of MAI 11.06:

> The opinion was not a vague reference to "that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession." The expert's opinion was, rather, specific to what a thyroid surgeon should do who is performing this specific operation, a thyroidectomy, for the specific reason he was doing it.

*Hickman,* 256 S.W.3d at 124. As a result, the *Hickman* Court concluded, "[t]here was sufficient evidence as to the standard of care from which the jury could conclude, as it did, that [the surgeon] was negligent and that, therefore, [the defendant medical clinic] was liable to the [plaintiffs] for the damages the jury found." *Id.*

█ We find that the same is true here. Although it did not employ the precise words of MAI 11.06, Dr. Rushing's testimony made clear at the outset that he was offering opinions concerning "the standard of care applicable to physicians who practice in the field of internal medicine." Dr. Rushing explained that his knowledge of the proper standard of care was based on his education and experience, which he had previously described to the jury in detail. He testified that he had previously given expert testimony "between 200 and 300 times," and that in each case he had applied "the standard for somebody who does exactly the same thing I do"; "I confine my activities to people in positions who do the same kind of practice I do." Further, by testifying that the applicable standard of care did not vary from state to state, Dr. Rushing made clear that he was applying a standard that was not only specific to the field of internal medicine, but one that was generally accepted and applicable to internists across the United States.

Dr. Rushing testified that, in light of Julia's prior, adverse reaction to an injection of Nubain and Vistaril, the fact that Julia had lost a substantial amount of weight since her previous adverse reaction, the fact that the June 28 injection contained significantly higher dosages of Nubain and Vistaril than were in the shot that caused Julia's previous reaction, and in light of Julia's very specific instructions that she never receive that combination of drugs again, Dr. Prohaska's administration of the Nubain/Vistaril shot on June 28 fell below the accepted standard of care. Dr. Rushing testified that, in light of the circumstances surrounding the March 1999 incident, Dr. Prohaska should have known that Julia would experience a bad, and likely more severe, reaction if given a similar injection again. Dr. Rushing also testified that Dr. Prohaska had a duty to investigate the specifics of Julia's prior adverse reaction to the Nubain/Vistaril injection, because Dr. Prohaska "had a responsibility to know what medicines that her patient's allergic to." Dr. Rushing explained that, in his opinion, which he held to a reason-

able degree of medical certainty, Dr. Prohaska "exhibited complete disregard to the safety of [Julia]," and specifically that Dr. Prohaska "inappropriately administered the medicine," and that Dr. Prohaska should not have given the Nubain/Vistaril shot "because of [Julia's] previous allergic reaction" and "because Mrs. Lake had told her not to do that."

While Dr. Prohaska levels numerous criticisms at the specific phrasing Dr. Rushing used in his testimony, we do not believe that those wording issues require a different result. For example, Dr. Prohaska complains that, after stating that he was familiar with the nationwide standard of care applicable to internists due to his education, training, and experience as an internal-medicine practitioner, Dr. Rushing stated that "I know what's right and wrong." Despite Dr. Prohaska's arguments, however, we believe this statement is, in context, fully consistent with application of an objective standard of care, rather than an impermissibly personal, subjective standard of Dr. Rushing's own making. While Dr. Rushing later testified that it was "common sense" not to re-administer particular medications to Julia Lake in light of her prior adverse reactions, this comment was immediately preceded by references to Dr. Rushing's earlier discussion of the standard of care, and his opinion that Dr. Prohaska should not in the circumstances have authorized the Nubain/Vistaril injection which allegedly caused Julia's shoulder injuries on June 28, 1999. The single reference to "common sense" during Dr. Rushing's day-long testimony does not announce a different, inappropriate standard. Moreover, in light of *Hickman,* and the discussion of Dr. Rushing's understanding of the standard of care at the outset of his opinion testimony, his later statements as to what "should" have been done, or what was "proper" or "improper," or "appropriate" or "inappropriate," do not suggest that Dr. Rushing applied an improperly personal, subjective, or vague standard of care.[3]

Taken in the light most favorable to Lake, and considered in light of the Supreme Court's recent—and controlling—decision in the *Hickman* case, Dr. Rushing's testimony was sufficient to support the jury's finding that Dr. Prohaska's actions fell below the standard of care that would have been exercised by similarly-situated physicians who practice in her medical specialty, in the circumstances Dr. Prohaska faced. The trial court erred in granting Dr. Prohaska's JNOV motion on the basis that Dr. Rushing failed to properly define the appropriate standard of care.

## II.

■ Nor can the circuit court's JNOV be sustained based upon Lake's alleged failure to establish causation.

Lake's theory of causation was that, but for Dr. Prohaska's negligent administration of the Nubain/Vistaril injection, Julia would not have suffered the syncopal episode in the bathroom of Dr. Prohaska's office. Lake's theory was that the syncopal episode caused Julia to strike her shoulder on the bathroom sink, severely injuring it, and causing her pain for years following the incident.

---

3. Dr. Prohaska also complains of Dr. Rushing's testimony that she "exhibited complete disregard to the safety of the patient," which Dr. Prohaska now argues applies "a standard of care equivalent to that used for imposition of punitive damages." Even if it were true that, in this one instance, Dr. Rushing opined that Dr. Prohaska's conduct was sufficiently egregious to satisfy the demanding standard for an award of punitive damages, we fail to see how the use of such a standard (as opposed to a simple negligence standard) could have prejudiced Dr. Prohaska.

A medical malpractice plaintiff is not required to prove causation by direct evidence; indeed, causation may be established circumstantially. *Laws*, 218 S.W.3d at 467. "A submissible case for causation is made if substantial evidence is presented that the injury is a natural and probable consequence of the defendant's act or omission." *Id.* (internal quotation marks omitted). Sufficient evidence exists "if the logical conclusion from the evidence is that if certain things had been properly done certain results would not have occurred, and such results *did* occur." *Id.* (internal quotation marks omitted). As a result, Lake's medical expert was not required to "directly state that [the administration of the Nubain/Vistaril shot] caused the injury." *Id.*

When viewed in the light most favorable to Lake, the evidence was sufficient to establish a submissible case on the issue of causation. As described above, Dr. Rushing testified that, given the circumstances, Dr. Prohaska's administration of the combination of Nubain and Vistaril to Julia on June 28, 1999, breached the applicable standard of care. Dr. Rushing further testified to his opinion that Julia suffered the syncopal episode and shoulder injury as a result of Dr. Prohaska's negligent administration of the Nubain/Vistaril injection. Thus, Dr. Rushing testified in a narrative form that "the injury [flowing from Dr. Prohaska's negligence] was, of course, the subsequent dislocation of her shoulder and all of the problems that followed that. And this was an artificial shoulder that dislocated and that's even more serious than dislocating a normal shoulder." Lake's counsel then specifically asked Dr. Rushing for his causation opinions:

Q. Do you have an opinion as to whether she suffered an injury directly because of that negligence.

A. Yes, I do.

Q. And the injury was?

A. The dislocation—her syncopal episode and her dislocation of her artificial shoulder.

While the parties clearly disagreed as to whether Dr. Rushing was entitled to express an opinion as to whether the June 28 incident required the removal of a portion of Julia's artificial shoulder prosthesis, and the circuit court instructed the jury to disregard his testimony "that the incident in Dr. Prohaska's office led to surgery," his testimony that the Nubain/Vistaril injection caused her fall and resulting shoulder injury—including dislocation of her shoulder—remained in evidence. Dr. Prohaska's own Discharge Summary for Julia's June 28, 1999 office visit indicated that Julia's shoulder "ha[d] now been re-dislocated after a syncopal episode in the office." Julia herself testified by deposition to her severe reaction to the Nubain/Vistaril injection on June 28, 1999 (consequences Dr. Rushing testified were consistent with an allergic reaction), and her caregiver and her husband both testified to her condition immediately thereafter. In addition, Julia, her husband, and her brother each testified that her shoulder pain was more severe following her fall in Dr. Prohaska's office than any pain she had experienced prior to the June 28 fall, and that her life changed drastically as a result.[4]

Dr. Prohaska's insistence that we should focus on the evidence she presented to establish that Julia's damages were not caused by the fall (including evidence con-

---

4. Additional expert testimony addressed Julia's post-June 28, 1999 difficulties with her right shoulder, and supported a finding that these medical problems were related to the June 28, 1999 shoulder dislocation. Because Dr. Prohaska does not challenge the extent of the non-economic damages the jury awarded

cerning Julia's admittedly extensive and complex prior medical history, and testimony that suggested that the fall did not, in fact, even occur) misses the point. In reviewing the trial court's grant of JNOV, we are to view the plaintiff's evidence in the light most favorable to the jury's verdict, and disregard all contrary evidence. Taken in the light most favorable to Lake, his expert testimony and the other evidence he presented supported the jury's finding that, but for Dr. Prohaska's negligence in the administration of the Nubain/Vistaril shot, Julia would not have fainted, and therefore would not have suffered the injury to her shoulder when she fell against the bathroom sink in Dr. Prohaska's office, or incurred her resulting non-economic damages.

Under the appropriate standard of review, we must uphold the jury's verdict unless—viewing the evidence in Lake's favor and disregarding all contrary evidence—" 'there is a complete absence of probative fact' regarding the element of causation." *Edgerton,* 280 S.W.3d at 70 (quoting *Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 250 (Mo. banc 2006)). Under this standard, we conclude that the trial court's entry of JNOV in Dr. Prohaska's favor based on a lack of sufficient evidence of causation was erroneous.[5]

### Conclusion

The judgment is reversed, and the case remanded to the circuit court for entry of judgment on the jury's verdict.

All concur.

to Lake, however, we find it unnecessary to discuss this additional evidence in detail.

5. Because we agree with Lake's challenges to the merits of the circuit court's JNOV ruling, we do not address his first Point Relied On, which makes a procedural argument.