

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| CYNTHIA L. WATERS, | ) | |
| | ) | |
| Appellant, | ) | WD77843 |
| | ) | |
| v. | ) | OPINION FILED:  October 13, 2015 |
| | ) | |
| MERITAS HEALTH CORPORATION | ) | |
| D/B/A NORTHLAND CARDIOLOGY | ) | |
| AND JAMES H. MITCHELL, M.D., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable Janet L. Sutton, Judge

Before Division Four:  Alok Ahuja, Chief Judge, Presiding, Gary D. Witt, Judge and
S. Margene Burnett, Special Judge

This appeal arises out of an action brought by Appellant, Cynthia Waters ("Waters"), in which Waters sought damages arising out of the treatment of her deceased husband Robert Waters ("Robert")[1] by Respondents Meritas Health Corporation d/b/a Northland Cardiology ("Meritas") and Dr. James H. Mitchell ("Dr. Mitchell" and collectively with Meritas, the "Respondents").  Waters alleged that Respondents were negligent in Robert's care and thereby caused his death.  After a jury trial that resulted in

---

[1] Because Appellant Cynthia Waters and the deceased Robert Waters share the same last name, we will refer to Robert Waters as "Robert" and Cynthia Waters as "Waters."  No familiarity or disrespect is intended.

a verdict in favor of Respondents, Waters now brings two points on appeal. For the reasons explained herein, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

**Medical Diagnosis and Treatment**

On the evening of August 30, 2007, Robert experienced chest pain and proceeded to the Emergency Room at North Kansas City Hospital ("North Kansas City") with his wife. Tests conducted in the Emergency Room determined that no cardiac event had taken place, but Robert was admitted for further observation and tests the following day. On August 31, 2007, Dr. Greg Cummings ("Dr. Cummings"), a hospitalist at North Kansas City, examined Robert and determined he had suffered a cardiac event during the night.

Robert's case was assigned to Dr. Steven Starr ("Dr. Starr"), an invasive, non-interventional cardiologist, who performed an angiography to determine the condition of Robert's heart. Dr. Starr found that Robert had multiple blockages in his heart including plaques that blocked:

- 20% of the left main artery;

- 30% of the proximal and mid portions of the left anterior descending artery ("LAD");

- 70% of the apex of the LAD;

- 60% of the proximal right coronary artery ("RCA");

- 40% of the mid portion of the RCA;

- 30% of the posterior lateral and posterior descending arteries in the RCA;

- 90% of the circumflex artery, extending into the second obtuse marginal branch.

Dr. Starr noted that Robert had mild problems in his left main artery and his left anterior descending artery. In addition, Dr. Starr noted a stenosis, meaning a narrowing, of Robert's circumflex artery, which is the artery that is the major branch providing blood to the back of the heart. Dr. Starr determined the blockage should be addressed and called Dr. Mitchell to review the case and decide whether it was necessary to proceed with an intervention.

**Dr. Mitchell's Intervention**

Dr. Mitchell arrived in the Cath Lab to review Robert's films and took over as attending physician at 2:48 p.m. Dr. Mitchell decided to proceed with an angioplasty procedure, which is a procedure whereby wires and catheters are inserted into a patient's arterial system and, using stents and balloons, opens up the arteries to increase blood flow to the heart. Using x-ray dye and viewing the heart through an x-ray monitor, the doctor is able to identify and target specific areas of the heart where blockages appear.

Dr. Mitchell intended to place stents at the bifurcation of the occlusion (blockage) in the circumflex and second obtuse marginal arteries inflating them simultaneously using a "kissing balloon technique." The first wire was placed past the blockage deep into the lumen of the second obtuse marginal at approximately 3:02 p.m. Dr. Mitchell then placed the second wire and attempted to advance it past the blockage into the distal end of the circumflex artery but was unsuccessful. Dr. Mitchell then made two additional attempts with two other wires but was equally unsuccessful. At approximately 3:05 p.m.,

3

Dr. Mitchell created a dissection plane in Robert's circumflex artery during one of his attempts to get the wire past the blockage in the distal circumflex. A dissection plane is an injury to the artery wall which obstructs blood flow through the vessel. The dissection became visible on the cineangiogram film at 3:10 p.m.

The parties disagree over whether Dr. Mitchell recognized the dissection in the circumflex artery at 3:10 p.m. Waters identifies early deposition testimony by Dr. Mitchell that indicates Dr. Mitchell did not believe the dissection to the circumflex artery occurred at 3:10 p.m. during the procedure but rather occurred much later following CPR. Waters also points to Dr. Mitchell's handwritten notes and typed procedure notes, which do not mention a dissection in the circumflex artery, as evidence of Dr. Mitchell's alleged failure to timely recognize the dissection.

Dr. Mitchell admits that, early in his first deposition, he was mistaken as to the time and cause of the dissection. He states that once he was allowed to review the films to refresh his memory, he recalled that he had identified the dissection in the circumflex artery at 3:10 p.m. during the procedure. Dr. Mitchell testified that, despite the dissection, his goal remained to get the wire past the distal circumflex dissection to place a stent to open the artery.

Shortly following the dissection of the circumflex artery, while Dr. Mitchell was still attempting to pass the wire into the distal circumflex, Robert began complaining of upper back pain. Robert was administered sedatives, but these failed to have the desired calming effect. Additional sedatives were administered to Robert but to no avail. Robert struggled, trying to get off of the table and required physical restraints.

4

At approximately 3:30 p.m., Dr. Mitchell called for the anesthesiologist to further sedate and intubate Robert so the procedure could continue. Five minutes later, the anesthesiologist Dr. Bruce Durkee ("Dr. Durkee"), arrived and administered succinylcholine to paralyze Robert's diaphragm in preparation for the intubation procedure. Unfortunately, Robert was not able to be intubated due to resistance and physical features of the patient, and his oxygen levels began to fall to dangerously low levels. At some point, a second dissection occurred in the left main coronary artery. At 3:43 p.m., Robert lost blood pressure and his heart arrested. CPR was administered, and a difficult intubation tray, which had been requested, arrived and was successfully inserted by 3:48 p.m. Robert's heart, however, remained in arrest. Resuscitative measures were continued. Unfortunately, Robert was pronounced dead at 4:45 p.m. Waters brought suit against Dr. Mitchell, individually, and Meritas. In her Amended Petition, Waters asserted one count of wrongful death against Respondents based on allegations of medical negligence.

**Trial Advertisements**

Trial in this case began on June 2, 2014. On the morning of June 4, the trial court informed the parties that there was a newspaper advertisement in The Kansas City Star's 816 North section which featured Dr. Mitchell. The advertisement showed Dr. Mitchell with a patient whom the advertisement claimed received lifesaving care from Dr. Mitchell. The advertisement included a link to a website in which the patient gives a testimonial about the cardiac care he received from Dr. Mitchell. The advertisement was marked for identification but was not admitted or published to the jury. Waters moved to

strike Respondents' pleadings, citing the prejudicial effect of the advertisement, which was denied by the trial court.

The following day, June 5, the trial court notified counsel that a member of the jury had brought a copy of the advertisement with him to the courthouse. The trial court and counsel for the parties spoke with the juror, out of the presence of the other jurors, regarding the advertisement. The juror advised the court that he brought the advertisement in to bring it to the trial court's attention and that other members of the jury had seen the advertisement as well. The juror indicated that the jury had not discussed the advertisement or anything regarding the advertised website. The juror was asked whether having seen the advertisement would affect his ability to be fair and impartial to both sides. He responded no.

Waters asked the court to declare a mistrial, to which the Respondents stated they were not opposed. As the trial was well under way and the juror had indicated the advertisement would not affect his ability to be impartial, the trial court refused to declare a mistrial. Respondents suggested that the court interview each of the jurors to see who exactly had seen the advertisements and determine whether their impartiality had been impacted. Waters did not support that approach, arguing that it would only draw more attention to it and exacerbate the issue. The trial court specified that "for the record there's been no indication from anybody that any juror has reviewed anything on the internet in violation of the Court's instructions. The only thing we've got proof of is they have the actual [advertisement] from the paper."

6

A second direct mailing advertisement was sent to the residents of Clay County on June 9, 2014, featuring Dr. Zafir Hawa ("Dr. Hawa"), another cardiologist at Meritas, who testified at trial. This advertisement was also brought to counsels' attention by the trial court. There is no evidence in the record that this mailing was seen by any member of the jury.

**Jury Instructions**

Prior to the formal instruction conference, the day before the final day of trial, the trial court and counsel held an informal, off the record, instruction conference. After those discussions, the trial court provisionally approved the verdict directing instruction submitted by Waters regarding Respondents' alleged negligence. That instruction read in relevant part, "Second, Defendant James H. Mitchell, M.D. failed to timely recognize and treat obstructions of blood flow *in the left main coronary artery* that occurred during catheterization" (emphasis added). At the formal instruction conference after the close of all of the evidence, Waters attempted to submit a revised verdict directing Instruction A ("Instruction A"), which read in relevant part, "Second, Defendant James H. Mitchell, M.D. failed to timely recognize and treat obstructions of blood flow *to the heart* that occurred during catheterization" (emphasis added). The trial court rejected Instruction A and used the instruction previously approved.

After the jury returned a verdict in favor of Respondents, Waters filed a Motion for a New Trial, arguing that it was error not to submit Waters's Instruction A and that she was prejudiced by improper contact by Respondents with the jury through the

7

advertisements, such that she was deprived of a fair trial. The trial court denied her Motion for New Trial. Waters now appeals.

In Point I, Waters argues that the failure to submit Instruction A was in error and, in Point II, Waters claims that she was denied a fair trial due to the advertisements' prejudicial effect on the jury. For ease of analysis the court will first address the threshold issue in Point II of whether Waters was deprived of a fair trial by improper contact with the jury.

## POINT II

In Point Two, Waters argues the trial court erred in refusing to grant her Motion for Mistrial or, alternatively, in failing to grant her Motion for a New Trial, because attempts were made by entities closely affiliated with Respondents to improperly influence the jury by the placement of advertisements containing information that would not have been admissible at trial and these advertisements were actually seen and discussed by jurors during trial. Waters argues that such acts should result in presumed prejudice and thereby shift the burden of showing the absence of prejudice to Respondents, and that Respondents failed to sustain this burden. Accordingly, Waters argues she was deprived of a fair trial and the cause should be remanded for a new trial.

### Standard of Review

"It has been consistently and uniformly held in this state that the granting of a new trial on the grounds of juror [or party] misconduct lies within the sound discretion of the trial court." *Berry v. Allgood*, 672 S.W.2d 74, 78 (Mo. banc 1984) (citations omitted). This is because "[t]he trial court hears the evidence concerning the alleged misconduct

8

and is, therefore, in the best position to determine the credibility and intent of the parties and to determine any prejudicial effect of the alleged misconduct." *Mathis v. Jones Store Co.*, 952 S.W.2d 360, 364 (Mo. App. W.D. 1997).

> The trial court abuses its discretion when:

> [A] ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. The denial of a new trial would be an abuse of discretion if it were based on findings not substantially supported by the record.

*St. Louis Cty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 134 (Mo. banc 2013) (internal citations omitted). "In reviewing a trial court's order denying a motion for a new trial, the evidence is viewed in a light most favorable to the trial court's order." *Id.* "[I]n the final analysis, every case rests upon its own particular facts and a large discretion is rightly vested in the trial judge who sits as an intimate observer of the whole chain of events." *Mathis*, 952 S.W.2d at 364 (quoting *Sunset Acres Motel, Inc. v. Jacobs*, 336 S.W.2d 473, 479 (Mo. 1960)).

**Analysis**

On this issue of first impression, Waters and Respondents disagree about the standard of review which applies to the conduct at issue. Waters argues that a deliberate advertising campaign, which reaches the jury, is analogous to cases involving deliberate juror misconduct where, for example, a juror has taken it upon themself to gather evidence outside of trial. In such cases, prejudice is ordinarily presumed and the burden shifts to the respondent to overcome a presumption of prejudice. *See Travis v. Stone*, 66 S.W.3d 1, 3 (Mo. banc 2002); *McBride v. Farley*, 154 S.W.3d 404, 409-10 (Mo. App.

9

S.D. 2004).  The burden-shifting presumption of prejudice has been consistently applied where a juror actively seeks out extrinsic evidence pertaining to the issues at trial.  *See Douglass v. Mo. Cafeteria, Inc*. 532 S.W.2d 811, 813 (Mo. App. 1975) (trial court's decision to grant new trial on basis of juror misconduct upheld where jurors visited scene of plaintiff's slip-and-fall for the purpose of gaining information to help in deciding the case and then discussed observations with other jurors); *Stotts v. Meyer*, 822 S.W.2d 887, 890-91 (Mo. App. E.D 1991) (trial court's denial of new trial reversed where juror visited the scene of the accident, made observations, and reported his observations to other jurors).  However, in these cases the juror has intentionally and directly violated the instructions of the court as to conduct which is legally prohibited.

This court finds this analogy less than persuasive.  Respondents and Waters agree that this is not a case where a juror has deliberately set out to gather facts extrinsic to trial.  In such cases, strong prejudice is presumed because it involves "reprehensible conduct" directly contrary to the court's instructions to the jury that "evidenc[es] a disposition not to be governed by the evidence adduced at court [ . . . . ]" *Middleton v. Kansas City Pub. Serv. Co*., 152 S.W.2d 154, 158 (Mo. 1941).  No such violation of the jury instructions is present here where the advertisement literally landed on the juror's driveway or in their mailbox.  Accordingly, no such presumption of prejudice is warranted.  Therefore, this issue should not be governed by cases that involve deliberate extrinsic research or investigation by a juror.

The facts here fit more closely with cases in which there has been contact between a juror and a party to the litigation.

10

The appropriate test for juror and party misconduct is as follows:

> Parties and jurors should avoid all appearance of evil, and if any contact motivated by improper design appears, the jury should ordinarily be discharged or a new trial granted, regardless of the existence of actual prejudice. Accidental and casual contacts with jurors are of rather common occurrence and often unavoidable. If the contact has been wholly innocent, a mistrial should not ordinarily be granted unless it can reasonably be found that there was some improper influence on the jury. Where a juror, by some inquiry or voluntary statement has raised a question as to his impartiality, the question becomes essentially one of fact, and primarily this decision rests with the trial court.

*Mathis*, 952 S.W.2d at 364 (quoting *Sunset Acres Motel, Inc.*, 336 S.W.2d at 479 (emphasis added)).

The first stage of the inquiry is to determine whether there was contact with the jury motivated by improper intent. First, the only contact at issue is the receipt by at least one juror of a newspaper advertisement featuring Dr. Mitchell in the 816 (Northland) section of The Kansas City Star.[2] The trial court explicitly found that the website featuring the testimonial of Dr. Mitchell's patient promoted in the advertisement was not at issue. The juror who was observed with a copy of the advertisement in the courthouse stated that he had not been to the website. The juror did state that other jurors had seen the advertisement and had discussed it. The juror further stated that nothing in the advertisement would affect his ability to be fair to both parties in the action. Based on the trial court's ruling, the trial court was satisfied that the juror was being truthful in this assurance.

---

[2] The advertisement was paid for by North Kansas City Hospital. North Kansas City Hospital is not a party to the action, but is the owner of Meritas, which is a named defendant. Meritas is the entity which holds ownership of the various medical practices that have been purchased from doctors by North Kansas City Hospital.

In addition, the trial court indicated it was satisfied that no juror would have been on the website, given the trial court's instructions not to go online. Counsel for Respondents suggested that perhaps each of the jurors should be questioned regarding who had seen the advertisement to determine any prejudice, but counsel for Waters did not support that course of action as he thought it could draw additional attention to and aggravate the issue. Finally, there is no evidence in the record that any juror saw the second advertisement, featuring Dr. Hawa, and neither counsel requested that jurors be questioned regarding this advertisement. Accordingly, we are left only with evidence that one and likely additional members of the jury saw the newspaper advertisement in The Kansas City Star.

Here, there was no evidence beyond conjecture that North Kansas City Hospital, Meritas, Dr. Mitchell or any other individual deliberately orchestrated an advertising campaign with the intention that it reach or influence the jury during trial.[3] All of the evidence in the record suggests to the contrary. The evidence before the court was that Dr. Mitchell was unaware that the advertisements would be published or disseminated during trial and that he was not aware the website with the testimonial was still available online. Dr. Mitchell was not involved with making decisions regarding the marketing campaign.

Numerous affidavits support Respondents' contention that none of Meritas' employees were responsible for or knowledgeable about the timing or content of the

---

[3] Certainly, if such a coincidence would occur during any future trials involving North Kansas City Hospital or its subsidiaries or affiliates, the trial court in that matter may consider the events of this trial in making its determination as to the intent of the parties.

12

publication of the newspaper advertisement. They were not responsible for planning and played no role in the scheduling of the advertisement. In addition, affidavits from management at North Kansas City Hospital indicate that an outside advertising agency was responsible for the campaign and that no one at North Kansas City knew the advertisements were scheduled to run during the trial. The advertisements were part of a comprehensive advertising campaign for North Kansas City that featured additional medical specialties as well. Apart from conjecture, Waters has presented no evidence that the advertisements were a deliberate strategy concocted by any of the Respondents or North Kansas City aimed at improperly influencing the jury. The trial court, being in the best position to judge the credibility and intent of the parties, did not find intentional contact motivated by improper design. This court defers to the trial court's finding on this issue.

Because the contacts were not motivated by improper design but accidental, the question then becomes whether the contact had an improper influence upon the jury such that a new trial is warranted. The burden is on Waters to show that the contact resulted in an improper influence on the jury. *Berry*, 672 S.W.2d at 78. Waters concedes that if it is her burden to show an improper influence upon the jury, her point must fail. We agree.

As explained above, the one juror known to have seen the advertisement was asked about whether it would have any impact on his ability to fairly and impartially decide the case. He stated that it would not have an impact and he could do so. The trial court found this testimony credible. This juror stated that he was aware that other members of the jury had seen the advertisement as well. However, given the opportunity

13

to inquire further, Waters's counsel decided against questioning the individual jurors for fear of exacerbating the issue. This may have been a reasonable strategic decision, but it also means that Waters cannot now claim that additional jurors may have been improperly influenced, as she waived the opportunity to timely discover this information. *See Polen v. Kansas City Chip Steak Co*., 404 S.W.2d 416, 422 (Mo. App. 1966) ("One cannot complain in an appellate court that an action of the trial court was error if he himself invited that action and acquiesced in it."*); G.H. v. Eli Lilly & Co*., 412 S.W.3d 326, 332 (Mo. App. W.D. 2013) ("It is axiomatic that a 'party cannot lead a trial court into error and then ...' lodge a complaint about the action.")

There is no evidence in the record before this court that any juror was unable to fulfill his or her responsibilities fairly and impartially. We cannot say the trial court abused its discretion in denying Waters's Motion for a New Trial on these grounds.[4]

Point II is denied.

## POINT I

In Point One, Waters argues the trial court erred in denying her tendered Instruction A because she made a submissible case of negligence, as stated in Instruction A, in that the jury heard substantial evidence from Dr. Mitchell that supported a broader theory of negligence than was included in the verdict directing instruction actually given

---

[4] Waters combines here arguments regarding the purported error of the trial court's refusal to grant a new trial with the court's refusal to grant a mistrial. "A mistrial is a drastic remedy. The decision to grant a mistrial is largely within the discretion of the trial court, and we will reverse a denial of a motion for mistrial only when there has been a manifest abuse of discretion. A manifest abuse of discretion occurs only when the error is so grievous that the prejudice cannot be removed." *Peel v. Credit Acceptance Corp*., 408 S.W.3d 191, 215 (Mo. App. W.D. 2013) (internal citations omitted). For the reasons stated above, the trial court also did not err in failing to grant a mistrial.

14

to the jury, thereby depriving Waters of the right to have the jury consider her theory of the case as supported by the evidence.

## Standard of Review

The determination of whether a jury was instructed properly is a question of law, which this court reviews *de novo*. *Barkley v. McKeever Enters., Inc*., 456 S.W.3d 829, 836 (Mo. banc 2015) (citing *Doe 1631 v. Quest Diagnostics, Inc*., 395 S.W.3d 8, 13 (Mo. banc 2013)). That review considers the evidence "in the light most favorable to the submission of the instruction, and if the instruction is supportable by any theory, then its submission is proper." *Id*. (citing *Bach v. Winfield–Foley Fire Prot. Dist*., 257 S.W.3d 605, 608 (Mo. banc 2008)). "Any issue submitted to the jury in an instruction must be supported by substantial evidence 'from which the jury could reasonably find such issue.'" *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010) (quoting *Kauzlarich v. Atchison, Topeka, & Santa Fe Ry. Co*., 910 S.W.2d 254, 258 (Mo. banc 1995)). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Id*.

## Analysis

Waters contends in Point I that the jury should have been allowed to find that Dr. Mitchell was negligent, not only in his treatment of Robert's left coronary artery, but also in his treatment of the circumflex artery. As stated by Waters, "[p]rior to the last day of trial, the case focused on Rob Waters's left main coronary artery, which Plaintiff contended had been dissected by Dr. Mitchell, that Dr. Mitchell failed to recognize that that had happened and, as a result, an obstruction in the left main coronary artery caused

15

blood flow to the heart to cease or decrease, causing a heart attack." Waters argues that Dr. Mitchell offered testimony, on the final day of trial, which, when combined with other evidence adduced at trial, supports the submission of Instruction A. Instruction A would have broadened Waters's theory of negligence to include the failure to timely recognize and treat obstructions "to the heart that occurred during catheterization" rather than just obstructions "in the left main coronary artery."[5]

In order to demonstrate a prima facie claim for medical malpractice, Waters had to "establish that (1) an act or omission of defendant failed to meet the requisite medical standard of care, (2) the act or omission was performed negligently, and (3) there was a causal connection between the act or omission and plaintiff's injury." *Laws v. St. Luke's Hosp.*, 218 S.W.3d 461, 466 (Mo. App. W.D. 2007) (quoting *Sheffler v. Arana*, 950 S.W.2d 259, 267 (Mo. App. W.D. 1997)). "The general rule requires that Plaintiffs put

---

[5] Respondents cite Rule 59.01(b) in arguing that that Dr. Mitchell's responses to Waters's Requests for Admissions removed from trial the issues of the failure to timely recognize and treat the circumflex dissections and their supposed role in causing the cardiac arrest. We disagree. Respondents are correct that Rule 59.01(b) is designed to remove certain issues from trial, and the rule accomplishes this by conclusively establishing admitted facts unless the court on motion permits withdrawal or amendment of the admission. The rule is not as conclusive as argued by Respondents. As an example, where a fact is stipulated, the party relying upon that fact is not foreclosed from offering evidence to prove the fact. *See State v. Hahn*, 35 S.W.3d 393, 396 (Mo. Ct. App. E.D. 2000) (right to offer evidence is not extinguished by a stipulation of fact). In addition, "the rule accords conclusiveness to admissions so that a party may rely on the fact that the admission *binds the party addressed*, unless the court permits withdrawal or amendment of the admission." *Felton v. Hulser*, 957 S.W.2d 394, 397 (Mo. App. W.D. 1997) (emphasis added). As stated by *Felton*, the purpose of admissions is to bind the party addressed. The rule does not prevent the proponent of a request for admission from obtaining conflicting evidence at trial. At that point, the issue becomes an issue of fact for the jury to resolve. *See Killian Constr. Co. v. Tri-City Constr. Co.*, 693 S.W.2d 819, 827 (Mo. App. W.D. 1985) (explaining that an admission made or deemed under Rule 59.01 is similar to an admission by a party in a pleading, and the admission does not bind the declarant when the adversary gives it no reliance but becomes an issue of fact to be decided by the jury). This same principal has been applied to judicial admissions and admissions in a pleading. *See, e.g., Vaughn v. Michelin Tire Corp.*, 756 S.W.2d 548, 557 (Mo. App. S.D. banc 1988); *Klein v. Kerr*, 272 S.W.3d 896, 901 (Mo. App. S.D. 2008); *Piel v. Piel,* 918 S.W.2d 373, 376 (Mo. App. E.D. 1996); *Plemmons v. Pevely Dairy Co.*, 233 S.W.2d 426, 434 (Mo. App. St.L. 1950). Of course, such a rule could lead to abuse, where a party, for example, seeks to induce the party opposite to assume a position that he would not have assumed and then at the last minute changes his theory of the case. In such instances, it is possible that the party could be estopped from denying an admission propounded by him and admitted by an opponent. *See Plemmons*, 233 S.W.2d at 434. No such allegation has been made here.

forth expert medical testimony establishing the appropriate standard of care" but the standard may also come from the defendant himself. *Redel v. Capital Region Med. Ctr.*, 165 S.W.3d 168, 172-73 (Mo. App. E.D. 2005) (citing *Delisi v. St. Luke's Episcopal–Presbyterian Hosp., Inc.*, 701 S.W.2d 170, 173 (Mo. App. E.D. 1985)).  Regarding the standard of care, medical negligence is "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession." *Hickman v. Branson Ear, Nose & Throat, Inc.*, 256 S.W.3d 120, 122 (Mo. banc 2008) (citing MAI 11.06).  This standard provides the basis for questioning an expert as to the standard of care and whether that standard has been met.  *Id*.  Stated another way,

> [i]n professional negligence cases, including actions against doctors, the specific duty is defined by the profession, itself.  That is, an expert witness is generally necessary to tell the jury what the defendant should or should not have done under the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession (and, thus, constituted negligence).

*Ostrander v. O'Banion*, 152 S.W.3d 333, 338 (Mo. App. W.D. 2004).

The decisive issue here is whether Waters actually obtained evidence sufficient to establish the appropriate standard of care and the alleged violation thereof by Dr. Mitchell.  Waters claims that Dr. Mitchell provided the necessary standard of care in his testimony on the final day of trial.  That testimony was as follows:

> Q.     [To Dr. Mitchell]  Failure to timely recognize and treat physician-caused coronary artery obstructions in 10 to 15 percent of the heart would be below the standard of care? Do you agree or disagree?
> A.     [By Dr. Mitchell]  Well, in a hypothetical patient, if it was an intervenable artery, then yes, I guess you could agree with that but not in Mr. Waters.

17

This is the sole support for Waters's attempt to establish the standard of care regarding Dr. Mitchell's treatment of the circumflex artery: the statement from Dr. Mitchell which expressly states that the proposition set forth by Waters is inapplicable to Robert. Dr. Mitchell's testimony does not support that he in fact failed to meet the standard of care in treating Robert. Waters pieces together testimony from Dr. Mitchell to show that Dr. Mitchell (1) recognized the obstruction in the circumflex artery, (2) knew it was blocking 10 to 15 percent of the blood flow to the heart, and (3) knew the artery was intervenable; however, this does not negate Dr. Mitchell's express disavowal that the failure to recognize and/or treat the obstruction fell below the standard of care in Robert's case.

This court cannot know the reason why Dr. Mitchell testified that even though he generally agreed with the proposition that the proposition did not apply to Robert because neither party asked him to further explain his answer. Dr. Mitchell's testimony suggests that two reasons could have been that (1) Robert's heart was co-dominant and (2) Dr. Mitchell did not believe the relevant artery was intervenable. However, we cannot speculate regarding all of the possible reasons for this belief. The point is that the standard of care applicable to Dr. Mitchell's treatment of the circumflex artery, under the circumstances similar to Robert's case, was never established, through the testimony of Dr. Mitchell or through other expert testimony.

Waters's own retained expert, Dr. Robert Safian ("Dr. Safian"), testified only that he did not believe that Dr. Mitchell's actions fell below the appropriate standard of care with regard to causing the dissection in the circumflex artery. It does not appear Dr.

18

Safian was asked about the standard of care with regard to recognition and treatment of dissections to the circumflex artery. Waters's case prior to the last day of trial focused entirely on the treatment of the left coronary artery. Waters has not identified any testimony by Dr. Safian, or any other medical expert, regarding the standard of care for the treatment of the circumflex artery under circumstances similar to Robert's or that Dr. Mitchell's conduct fell below the standard of care. There simply was not substantial evidence regarding the standard of care, and the alleged violation thereof, with regard to the recognition and treatment of a dissection in the circumflex artery to support the submission of Instruction A to the jury.

In addition, Waters failed to establish the element of causation to support the submission of Instruction A. "Any instruction submitted to a jury must be supported by substantial evidence." *Deckard v. O'Reilly Auto., Inc*., 31 S.W.3d 6, 17 (Mo. App. W.D. 2000). "When a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty." *Super v. White*, 18 S.W.3d 511, 516 (Mo. App. W.D. 2000). "When an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Id*.

Waters relies on testimony from three witnesses to support her contention that the "untreated dissection of Mr. Waters's circumflex artery caused or contributed to cause" his death. However, none of the three witnesses testified to a reasonable degree of medical certainty that the dissection of the circumflex artery did in fact cause or

19

contribute to Robert's death. Dr. Bode prefaced his testimony by saying that cardiology was not his area of expertise. While Dr. Bode did testify that if there was a significantly decreased blood flow to the circumflex artery, it would contribute to cardiac arrest, he never testified with any degree of medical certainty that the dissection of this artery did in fact contribute to Robert's death. Similarly, Dr. Barr testified only that the dissection of this artery "could have potentially" contributed to Robert's difficulties but also that he did not think it caused Robert's arrest. This equivocation is insufficient to establish causation. *See White*, 18 S.W.3d at 516. Finally, Dr. Cummins testified that he was "not a cardiologist or a forensic pathologist, so unless there's an autopsy showing what vessel goes where, I don't know whether [the circumflex dissection] could have caused the death or not." Dr. Cummins did not testify, to a reasonable degree of medical certainty, that the dissection in the circumflex artery did in fact contribute or cause Robert's death. Therefore, Waters failed to provide substantial evidence from which a jury could have concluded that the dissection of the circumflex artery caused or contributed to Robert's death. For this reason as well, the trial court did not err in refusing to submit Instruction A to the jury.

Finally, at the formal instruction conference, when Waters offered Instruction A, the only argument made to the trial court to support the submission of this verdict director was she "believe[s] the evidence supports the claims of both the failure to timely recognize and treat obstruction of blood flow not only to the left main coronary artery but also in the circumflex artery." This was the entirety of the argument made by Waters on the record. Waters did not direct the trial court to the specific evidence adduced that she

20

argues would support the submission of this new verdict directing instruction on a new legal theory which arose on the final day of evidence.

Accordingly, we hold the trial court did not err in refusing to submit Instruction A to the jury because neither the standard of care nor causation was supported by substantial evidence.

Point I is denied.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur